## LILLARD v. KENTUCKY DISTILLERIES & WAREHOUSE CO.

(Circuit Court of Appeals, Sixth Circuit. December 17, 1904.)

### No. 1,332.

1. PLEADING—DEMURRERS—ADMISSIONS OF FACT.
   Averments of fact in an answer and counterclaim must be taken to be true on demurrer.

2. CONTRACTS—CONSTRUCTION—CONTEMPORANEOUS AGREEMENTS.
   Agreements negotiated between the same parties or their representatives at the same time, and with reference to each other, may be looked

to in order to determine how far each is affected or interpreted by the terms of the other.

[Ed. Note.—For cases in point, see vol. 11, Cent. Dig. Contracts; § 746.]

**3. LANDLORD AND TENANT—LEASES—COVENANT—TRADE FIXTURES.**

The lease of a lot "to be used as a cattle feeding lot" does not require the lessee to put in cross-fences, or piping or troughs, or sheds, but merely gives him the permission so to do, with the right to remove the improvements at the end of the lease.

**4. CONTRACTS—CONSTRUCTION—USAGE.**

A distilleries company contracted to sell slop, to be delivered at a certain feeding lot. A contemporaneous contract between the parties provided for the lease of land by the purchaser of the slops to the distilleries company to be used as a cattle feeding lot. The lease also gave the lessors the refusal of the slop during any year, and provided that, if they should exercise the option, no rent should be paid for the lot. *Held*, that any obligation on the part of the distilleries company, arising out of custom and usage in the sale and delivery of slop, to deliver the same in a feeding lot adapted to feeding purposes, arose out of the contract for the sale of the slop, and not out of any express or implied obligation of the lease.

**5. SAME—CONTEMPORANEOUS AGREEMENTS—INDEPENDENT CONSTRUCTION.**

A distilleries company contracted to sell the slop made from part of its daily consumption of grain, and to deliver the same at a feeding lot. The price of the slop was settled by the contract. A contemporaneous agreement providing for the lease of land by the purchaser of the slop to the distilleries company, to be used as a cattle feeding lot, was executed. This agreement provided that the lessor should have the refusal of all the slop during any year at the market price, and that, in case the option was exercised, no rent should be paid for the lot. *Held*, that the two contracts were separate, and each was complete in itself, and required no reference to the other to be understood.

**6. SAME—CUSTOM AND USAGE.**

Written or oral contracts, especially such as relate to trade or mercantile agreements, are presumably made with reference to the known and established custom and usages which prevail in respect to such agreements. Evidence of such custom and usage is therefore admissible to explain the meaning of words or phrases which would otherwise not explain the intention of the parties, and also to annex to the contracts incidents which it is supposed the parties intended to tacitly annex, unless the words used necessarily exclude the operation of the custom or usage. But evidence of custom can neither contradict, destroy, nor modify language which is otherwise plain.

[Ed. Note.—Presumptions as to customs and usages, see note to Great Western Elevator Co. v. White, 56 C. C. A. 394.]

**7. LANDLORD AND TENANT—RELATION OF TENANT TO PROPERTY—EXEMPTION FROM LIABILITY FOR RENT.**

A distilleries company contracted to sell slop and deliver the same at a feeding lot. Contemporaneously with this agreement the purchaser agreed to lease a lot to the company, to be used as a feeding lot. The lease provided that the lessor should have the refusal of the slop for any year, and, in case he took it, no rent should be paid for the lot. *Held*, that the exercise of the option by the lessor did not terminate the lease or change the relation of the distilleries company to the property, and the feeding lot at which the company was obligated by its contract to deliver the slop was to be regarded as supplied by it, although the lot was owned by the purchaser of the slop, and the company was exempt from liability for rent while furnishing the slop.

**8. CONTRACTS—CONSTRUCTION—CUSTOM AND USAGE.**

Evidence of custom and usage explaining a written contract is not to be excluded unless the language employed by the parties is plainly irreconcilable with the rule imposed by custom.

9. SAME.

Evidence of custom or usage is admissible to show that a contract to deliver distillery slop at a cattle feeding lot supplied by the distiller contemplated, in accordance with the prevailing custom and usage in the making of like agreements, that the feeding lot should be supplied by the distillery with suitable cattle pens equipped with pipes, troughs, tubs, and tanks adapted to distribute the slop in a manner convenient for the feeding of cattle.

10. SAME—REPUGNANT PROVISIONS OF CONTRACT.

Nor was a further provision of the contract, giving the buyers of the slop the privilege of using troughs and tubs which the seller was to place in the feeding lot, repugnant to the alleged custom or usage, so as to exclude evidence thereof.

11. SAME—PLEADING.

An allegation in an answer that contracts were made in recognition of a custom and usage among distillers and feeders of slop, that the slop should be delivered to a feeding lot adapted and fitted for the feeding of slop to cattle by partition in suitable pens supplied with feeding troughs, tanks, and tubs, constituted a good averment that the contracts were made in recognition of the alleged custom, and did not aver a separate parol contract by which the feeding lot was to be appropriately supplied.

12. DAMAGES—GENERAL AND SPECIAL—DISTINCTION.

The distinction between general and special damages is that the former are such damages as the law implies and presumes from the breach complained of, while the latter are such as have proximately resulted, but do not always immediately result, from the breach, and will not, therefore, be implied by law.

13. SAME—RECOVERY OF SPECIAL DAMAGES.

Special circumstances will justify a recovery of special damages when specifically sued for, if they proximately flow from the breach, and are such as might reasonably be within the contemplation of the parties.

14. SAME—LOSS OF PROFITS.

Where the inherent and obvious purpose of an agreement for the sale of distillery slop was the procurement of slop to be delivered at a feeding lot in such a way that it might be economically fed to fatten cattle, the failure of the seller to furnish the slop which it contracted to supply, or its failure to deliver it in the manner contemplated under the contract, in such a way that it could be advantageously fed, would entitle the buyer to recover damages resulting from additional outlays for food or labor or any other expense, or injury to the cattle, including loss of anticipated profits from the sale of the cattle, provided such profits could be shown with reasonable certainty, and were not purely speculative.

15. SAME—DUTY TO PREVENT DAMAGE.

Where a contract has been breached the injured party must use reasonable exertions to save himself from the accruing loss, and can charge the defaulting party only with such damages as he cannot, with reasonable expense and exertion, prevent.

16. SAME—BREACH OF CONTRACT OF SALE—BUYER'S DAMAGES.

The measure of damages for a breach by the seller of a contract of sale is the difference between the contract and market price, for the buyer can indemnify himself by going into the market and supplying himself, if there is a market for the commodity.

17. SAME—PREVENTION OF DAMAGES—BURDEN OF PROOF.

The burden of proving that damages which have been sustained by a breach of contract could have been prevented by the injured party rests upon the party guilty of the breach.

18. SAME—PROMISES TO REPAIR BREACH.

A buyer of distillery slop for feeding purposes is not precluded from recovering damages for a breach of the provisions of the contract by

which the seller agreed to deliver the slop in suitable troughs and tubs for feeding purposes, by reason of the fact that he did not himself erect the proper appliances, where he relied on repeated promises of the seller to perform his obligations in the premises.

19. SAME.

The fact that the party injured by a breach of contract has suffered a greater loss than he reasonably should have suffered by reliance on the defaulting party's promises to make good the breach does not preclude him from recovering such damages as were sustained before he himself should have taken the requisite step to save himself from loss.

In Error to the Circuit Court of the United States for the Eastern District of Kentucky.

This is an action of assumpsit for the recovery of the price of distillery slops contracted to be delivered at a certain feeding lot, being all of the slop made from a daily consumption of 1,200 bushels of grain during the operation of the Cedar Brook Distillery between December 25, 1902, and May 25, 1903.

The plaintiff sets out a copy of a contract in writing between the parties, and avers that this slop was sold, delivered, and received according to the terms of this contract, but that the defendants have failed and refused to pay for same. The defendants filed an answer and counterclaim. In substance they deny that the writing produced by the plaintiff and sued upon constitutes the whole of the contract, and say that contemporaneously with the contract sued upon there was another written agreement in respect of the same subject-matter, and that, though the latter is dated November 18, 1902, and the former November 19, 1902, each was made with reference to the other, and that they should be read together as constituting one agreement. This contract of November 18th is set out and made part of defendant's answer. This agreement so set up as a part of the contract between the parties is primarily a contract for the lease of 30 acres of ground adjoining Cedar Brook Distillery, to be used as a feeding lot for cattle fed upon slop. from the distillery; and the right to put thereon, and remove at the end of the lease, all proper troughs, pipes, sheds, etc., proper for such use. The parties to this lease were the Julius Kessler & Co., a corporation engaged in the operation of Cedar Brook Distillery, and one W. F. Lillard, one of the defendants herein. The term of the lease was 10 years, with right of renewal, at an annual rental of $250. It was also provided that the lessor, W. F. Lillard, or his brother, R. H. Lillard, the other defendant herein, or the firm of Lillard Bros., here sued as partners, who are the parties of the second part to the contract for the sale of slops mentioned above, should have the refusal of the distillery slops during any year, at the market price, and that during any year that this option was exercised no rent should be paid for said lot. It is averred that said corporation styled Julius Kessler & Co. was either a trustee or agent acting for the plaintiff, the Kentucky Distilleries & Warehouse Company, a corporation of the state of New Jersey, and as such was operating said Cedar Brook Distillery for the use and benefit of the plaintiff, and made said contract of leasing with said W. F. Lillard for the use and benefit of said plaintiff and with reference to the contract for sale of slops to defendants, both of which agreements were negotiated together. It is then averred that both of said contracts were made in recognition of a custom and usage among distilleries and feeders of slop that the slop should be delivered in a feeding lot adapted and fitted for the feeding of slop to cattle by partition into suitable pens to prevent crowding, supplied with feeding troughs, tanks, and tubs, so constructed through the pens as to distribute the slop in the most economical way and to the best advantage in feeding cattle. The defendants deny the delivery of slop according to the terms of the contract, or that the plaintiff has complied with the terms of the agreement as alleged. By way of counterclaim defendants say that, in reliance upon the plaintiff's agreement to deliver its slop in such a suitable feeding lot adapted to economically feed same as delivered, and upon notice that plaintiff had provided suitable troughs, tanks, etc., as it was bound to do, they bought 1,421 head of cattle, paying for

same $45,922.80, and caused same to be delivered in the feeding lot adjacent to said distillery; but that plaintiff broke its contract, and did not supply a fit and suitable feeding lot properly divided into pens and supplied with suitable troughs, tubs, or tanks, etc., and that this failure to properly adapt said lot for the purpose intended continued for 12 weeks after delivery of slop commenced, at which time plaintiff did fit said place for delivery of slop, as it had bound itself to do. It is averred that plaintiff was notified of its failure to divide said lot into pens and to provide suitable troughs, tubs, etc., "and repeatedly promised to remedy said defects, and defendants, relying upon said promises, kept their cattle in said insufficient feeding lot, and tried to fatten their cattle as they had contemplated doing when their contract was made, but found themselves unable to do so." It is then averred that defendants' cattle were greatly damaged for the want of proper means for feeding and distributing said slop, some dying from crowding and some from starvation, while all suffered and lost weight; that no other slop was procurable; and that, to prevent greater loss, defendants bought grain and hay and fed same at great expense, but that, notwithstanding their efforts, they sustained great loss, and sue by way of counterclaim for the loss and injury resulting, which aggregates some $19,000. The plaintiff filed a general demurrer because no defense to plaintiff's petition or ground for counterclaim was stated. This demurrer was sustained. The defendants declining to plead further, there was judgment for the entire sum sued for.

L. W. McKee, L. C. Willis, and T. L. Edelen, for plaintiffs in error.
C. H. Stoll, for defendant in error.

Before LURTON, SEVERENS, and RICHARDS, Circuit Judges.

LURTON, Circuit Judge, after making the foregoing statement of the case, delivered the opinion of the court.

Two questions arise upon the demurrer to the answer and counterclaim filed by the defendant in error. The first concerns the terms of the agreement between the parties, and the second the measure of damages for the breach of same by the plaintiff. The first question may fairly be split into two parts: First. To what extent, if any, is the agreement for the sale of slops modified, enlarged, or affected by the agreement for the lease of the ground adjacent to the distillery, made contemporaneously with the other? Second. Was it competent to show the custom and usage in respect to the manner in which distillery slops were delivered for feeding purposes?

The first question is not difficult of solution. The averments of fact in the answer and counterclaim must be taken to be true. If, as averred, Julius Kessler & Co. were acting for the Kentucky Distilleries Company both in leasing the Lillard lot for feeding purposes and in the operation of Cedar Brook Distillery, and if, as averred, the two agreements were negotiated at the same time, and with reference to each other, we may look to both to see how far each is affected or interpreted by the terms of the other. When we do this, when we place the two contracts side by side, and read them together, we can only see that the distilleries company was looking forward to a sale of its slop, possibly to W. F. Lillard, possibly to his brother, or to both as a copartnership, and was by the lease preparing a place to be used by whoever should buy its slops as a feeding lot when slop should be delivered and fed to cattle.

The leasing contract does not in express terms obligate the lessee to divide the lot into pens, or put in pipes, or feeding troughs, tanks, or tubs, or to do any specific thing except to erect and maintain an outside fence. That the lot was leased "to be used as a cattle feeding lot" can hardly be regarded as a covenant to put in cross-fences, or piping or troughs, or sheds, but as a privilege, with the right to remove all such improvements at the end of the lease. If W. F. Lillard or Lillard Bros. should exercise the right to receive and feed the slops made at Cedar Brook Distillery—a right extended by the contract of leasing—a different question would arise; for, in the absence of some other agreement between the parties, there would be the question as to the operation of the custom and usage in the sale and delivery of such slop to deliver same in a feeding lot adapted to feeding purposes. But this would be an obligation or term of the agreement which would attach itself as a term of a contract for the sale of slop, and would not grow out of any express or implied obligation found in this contract of leasing. If we assume that Lillard Bros. had the right to take all the slop made by the Cedar Brook Distillery at the market price by virtue of the option contained in the lease agreement, they did not do so. Upon the contrary, they entered into a separate writing, by which they contracted for the slop from a daily consumption of only 1,200 bushels of grain, though it appears that the distillery had a daily mashing capacity of 1,800 bushels. The price for this slop is also settled, and not left to be determined by the market price. Each contract is apparently complete in itself, and needs no reference to the other to be understood.

The pivotal question raised by the demurrer is as to the effect to be given to the averment in the answer that both contracts were made with reference to and in recognition of a custom or usage that parties contracting to sell distillery slops for feeding cattle do so with the mutual understanding that the slop shall be supplied or delivered to a feeding lot supplied with suitable cattle pens equipped with pipes, troughs, tubs, and tanks adapted to distribute the slop in a manner for convenient feeding to cattle. The court below was of opinion that upon the facts of this case evidence of such a custom or usage would be inadmissible upon the ground that it would vary or contradict the terms of a written contract, or add a new term to a complete agreement. Nothing can be plainer than that it is not admissible to contradict a contract, written or oral, by evidence of a custom or usage. Barnard v. Kellogg, 10 Wall. 383, 390, 19 L. Ed. 987; Grace v. Cent. Am. Ins. Co., 109 U. S. 278, 279, 3 Sup. Ct. 207, 27 L. Ed. 932; The Gazelle, 128 U. S. 474, 486, 9 Sup. Ct. 139, 32 L. Ed. 496; Seitz v. Brewers' M. Co., 141 U. S. 510, 12 Sup. Ct. 46, 35 L. Ed. 837; Dennis v. Slyfield, 117 Fed. 474, 54 C. C. A. 520; 12 Cyclopedia, and cases cited, 1091. Touching the inadmissibility of custom or usage if repugnant to a term of contract, Justice Harlan has most happily stated the rule and its reason in Grace v. Am. Cent. Ins. Co., cited above. "In Barnard v. Kellogg," says the learned justice (10 Wall. 383, 19 L. Ed. 987), "this court quotes with approval the language of Lord Lyndhurst in

Blockett v. Royal Exchange Assurance Co., 2 Cromp & Jervis, 244, that 'usage may be admissible to explain what is doubtful; it is never admissible to contradict what is plain.' This rule is based upon the theory that the parties, if aware of any usage or custom relating to the subject-matter of their negotiations, have so expressed their intention as to take the contract out of the operation of any rules established by mere usage or custom." Every written or oral contract, and especially such as relate to trade or mercantile agreements, is presumably made with reference to the known and established custom and usages which prevail in respect to such agreements. Evidence of such prevailing custom or usage is therefore admissible for the purpose of explaining the meaning of words or phrases which would otherwise not explain the intention of the parties, and also to annex to such contracts certain incidents which it is supposed the parties intended to tacitly annex, when the words they have used do not necessarily exclude the ordinary operation of such custom or usage. But the evidence of custom can neither contradict, destroy, nor modify what is otherwise plain. Renner v. Bank of Columbia, 9 Wheat. 581, 587, 6 L. Ed. 166; Bliven v. New England Screw Co., 23 How. 420, 431, 16 L. Ed. 510, 514; Robinson v. U. S., 13 Wall. 363, 20 L. Ed. 653; 1 Addison on Contracts, § 56; Capitol Gas & Electric Co. v. Gaines, 49 S. W. 462, 20 Ky. Law Rep. 1468; Johnson v. Roylton, 7 Queen's Bench, 438; Florence Machine Co. v. Daggett, 135 Mass. 582; Bryan v. Spurgin, 5 Sneed, 681; The Delaware, 14 Wall. 579, 603, 20 L. Ed. 779; National Bank v. Burkhardt, 100 U. S. 686, 25 L. Ed. 766; Cyclopedia of Law and Procedure, vol. 12, p. 1082 et seq., and cases cited.

In Renner v. Bank of Columbia, cited above, evidence of a local custom that payment of a note should not be demanded until the fourth day after due, contrary to the law merchant, which gave only three days of grace, was held admissible in order to understand the intent of the parties to a note made in reference to it. Among other things, the court said:

"It is said, however, that the effect of this testimony is to alter and vary by parol evidence the written contract of the parties. If this is the light in which it is to be considered, there can be no doubt that it ought to be laid entirely out of view, for there is no rule of law better settled, or more salutary in its application to contracts, than that which precludes the admission of parol evidence to contradict or substantially vary the legal import of a written agreement. Evidence of usage or custom is, however, never considered of this character; but is received for the purpose of ascertaining the sense and understanding of parties by their contracts, which are made with reference to such usage or custom; for the custom then becomes a part of the contract, and may not improperly be considered the law of the contract, and it rests upon the same principle as the doctrine of the lex loci. All contracts are to be governed by the law of the place where they are to be performed; and this law may be, and usually is, proved as matter of fact. The rule is adopted for the purpose of carrying into effect the intention and understanding of the parties. That the note in question was to be paid at the Bank of Columbia, and to be governed by the regulations and custom of the institution, and so understood by all parties, cannot admit of a doubt."

In Bliven v. New England Screw Co., cited above, evidence was admitted of a custom of the factory to fill orders only in the order

in which they were received, in defense to a suit for not supplying a sufficient quantity of an article ordered.   The court said:

"Customary rights and incidents universally attaching to the subject-matter of the contract in the place where it was made are impliedly annexed to the language and terms of the contract, unless the custom is particularly and expressly excluded."

In Robinson v. U. S., cited above, evidence was received to show a usage of trade to deliver barley in sacks, the contract being silent as to how delivery should be made. So, too, evidence of custom or usage is admissible to interpret words or phrases in a contract, written or oral, which are of doubtful signification.   Barnard v. Kellogg, 10 Wall. 389, 390, 19 L. Ed. 987.

The contract in suit is not only peculiar in respect to its subject, but as to the conditions and place of delivery.   The daily product of slop is to be "delivered" by the distiller at a "feeding lot" supplied by the distiller.   How is this delivery to be made?   Is it to be piped, or delivered in barrels, tubs, or tanks?   Obviously this is a question which must be answered by reference to the usual and customary mode prevailing among those who furnish and those who feed such slop.   But it is to be delivered at a particular place supplied by the seller—a "feeding lot."   That this place is to be supplied by the seller is plain, although it has been suggested that when Lillard Bros. became themselves the purchasers and feeders of the slop made at Cedar Brook Distillery they themselves supplied the feeding lot.   This contention is founded upon a clause in the leasing contract which provided that, if the defendants should themselves exercise the option of feeding the distillery slop, the lessor, W. F. Lillard, should receive no rent for that season.   This is a specious argument.   The subject of the lease was an unimproved and unfenced parcel of 30 acres of ground.   It was leased for a term of 10 years at an annual rental of $250, "to be used for a feeding lot for cattle."   The expectation was that this naked lot would be adapted for use as a feeding lot, for the right to put in sheds, pipes, and troughs is granted, with the right to remove them at end of lease.   One term of the contract of leasing was that either or both of the Lillards might have an option to take the distillery slops during any season at market price, but that during the period of their exercise of this privilege they should receive no rent. But the exercise of this option would not terminate the lease or change the relation of the distillery company to the property.   It was nothing more, in substance, than an agreement that if the Lillards should choose to take the produce of slop during any season, they should pay the market price, and also remit rent otherwise demandable.   Now, what did the parties intend by the agreement that this daily product of distillery slop should be delivered at a "feeding lot" supplied by the distillery company, the plaintiff in this case?   How was delivery to be made?   What did they mean by a "feeding lot"?   Did they mean a bare lot, or one divided into suitable subdivisions, and supplied with feeding troughs, tubs, tanks, etc., adapted to receive and distribute distillery slop?   The question is not whether, under the leasing contract, there is an

implied agreement that the lessee shall subdivide the leased lot, or equip it with facilities for either feeding or caring for cattle, but whether, under the contract for the sale and "delivery" of slop at a "feeding lot," there is such an obligation.

The fourth clause of the contract for the sale of this slop provides that the buyers "shall have the privilege of using the necessary troughs and tubs which the first party [the Kentucky Distillery & Warehouse Company] is to place in feeding lot leased from W. F. Lillard." Of this claim the circuit judge said, in substance, that it implied no duty or obligation to place troughs, tubs, etc., in the feeding lot, but expresses a mere benevolent purpose, and confers the privilege of using same so far as necessary in case this purpose is carried out. Thus construed, the court was of opinion that evidence of a custom or usage which would impose a positive obligation would be repugnant. But we cannot agree to this interpretation. In reference to contracts where custom is ordinarily comprehended as part of the agreement the rule, as we understand it to be, is that evidence of such custom and usage is not to be excluded, unless the language employed by the parties is found to be plainly irreconcilable with the rule imposed by custom. The character of the contract here in issue is such as to raise a strong presumption that the agreement to deliver at a cattle feeding lot raises a strong presumption that the delivery is to be according to the prevailing custom under such agreements, and the obligations imposed by rule should be recognized as a part of this agreement unless the fourth clause of the contract plainly and explicitly manifests an intention to substitute for the obligation imposed by custom and usage the mere option of the seller to furnish the usual and necessary facilities for distributing and feeding such slop.

But there is another and more reasonable construction of this provision, when read in connection with its context and in the light of the prevailing custom under such contracts, and that is that its purpose was to limit the right of the Lillard Bros. to the use of only such feeding troughs, tubs, etc., as shall be necessary for the feeding of the slop contracted to them. This is a reasonable limitation of the rule imposed by custom or usage in such cases, in view of the fact that the mashing capacity of the distillery was 1,800 bushels of grain per day, while Lillard Bros. agree only to take the slop produced from a daily mash of 1,200 bushels. If, therefore, the feeding lot afforded feeding facilities for a greater number of cattle than could be expected to consume the slop contracted to Lillard Bros., this provision would limit their use to such facilities as were necessary, and enable the surplus of slop to be fed under some other arrangement. We therefore regard this clause as one which is not repugnant to the operation of the rule imposed by custom and usage, but a recognition of that usage. Without the aid of this evidence of custom this clause would be ambiguous, for it would not be clear whether an obligation to supply the necessary feeding troughs, tubs, etc., was imposed or a mere purpose to do so expressed. Neither do we think the answer and cross-claim should be interpreted as averring that there was

another and separate contract in parol, by which the feeding lot was to be subdivided, and supplied with suitable troughs, pipes, tubs, etc. The language used by the pleader means that such an agreement was made because the contract was made in recognition of the obligation imposed by operation of the prevailing custom. That the parties should in their negotiations recognize the rule of custom is not to add a new term by parol, but a recognition that it is a term of the written contract by operation of the custom.

The court also sustained the general demurrer because it was of opinion that none of the items of damage set out in the counterclaim were recoverable, assuming the contract to have been breached as averred. The cross-claim is for special items of damage, and includes no count for general damages. The items are: (1) The death of 67 head of cattle from crowding and starvation. (2) Loss of gain in weight and condition of cattle because insufficiently supplied with slop. (3) Cost of meal, hay, etc., and extra labor, necessitated by the failure to comply with the agreement. The ground upon which this conclusion is defended is that while the defendants might recover what it cost them to supply suitable troughs, pens, tubs, etc., and damages for any loss necessarily incurred while supplying the means for properly distributing slop for feeding, or loss of gain sustained by a prompt sale of the cattle when the distributing and feeding appliances were found insufficient, they did neither of these things, but continued to receive slop and feed it to their cattle, although the facilities were not such as they had a right to demand. The distinction between general and special damages is not always obvious. The one is supposed to be such damages as the law implies and presumes from the breach complained of, while special damages are such as have proximately resulted, but do not always immediately result, from such a breach, and will not, therefore, be implied by law. 13 Cyclopedia of Law, p. 13; Lawrence v. Porter, 63 Fed. 62, 64, 11 C. C. A. 27, 26 L. R. A. 167; Parsons v. Sutton, 66 N. Y. 92, 98. But special circumstances will justify recovery of special damages when specifically sued for, if they proximately follow from the breach, and are such as might reasonably be within the contemplation of the parties. Lawrence v. Porter, 63 Fed. 62, 64, 11 C. C. A. 27, 26 L. R. A. 167. The counterclaim avers, in substance, that prior to December 25, 1902, and before plaintiff had subdivided said feeding lot into suitable cattle pens or constructed suitable lead troughs, tubs, or tanks, and feeding troughs, plaintiff notified defendants "that the feeding pens, tubs, tanks, troughs, and slop would be ready on said date, and that plaintiff would be ready to deliver to the defendants the slop as it had contracted to do, and thereupon the defendants, relying upon said notice, and upon its said contract with the plaintiff," bought and placed in said feeding lot for the purpose of consuming the slop so to be delivered 1,421 head of cattle, but that plaintiff failed and refused to furnish suitable tubs, lead troughs, tanks, feeding troughs, etc., as it had agreed to do, and for a period of 12 weeks failed to comply with its contract until 12 weeks had elapsed. They also aver that plaintiff's attention was called to its failure in these respects, "and that plaintiff repeatedly promised to remedy said defects, and these defendants, relying on said promises, kept their cattle in the insufficient pens,

and tried to fatten their cattle as they had contemplated doing when the contract was made, but found themselves unable to do so." Now, the very object of this contract was to procure slop delivered in such way as that it might be economically fed for the purpose of fattening cattle. This purpose was one which inhered in the very nature of the agreement, and was therefore a purpose of which the distillery company had notice. Under such circumstances it is very obvious that if the plaintiff had furnished no slop, or had furnished only a part of that it contracted to supply, the loss resulting from any outlay for other food or for labor necessitated, or any other expense, as well as any injury to the cattle consequent upon insufficient supply of slop, would be recoverable as the natural and proximate result of the breach. Neither would defendants be necessarily excluded from recovering the damages resulting from loss of gain or profit anticipated, provided they are capable of being shown with reasonable certainty, and are not purely speculative. Hitchcock v. Anthony, 83 Fed. 779, 28 C. C. A. 80; U. S. v. Behan, 110 U. S. 338, 4 Sup. Ct. 81, 28 L. Ed. 168; Howard v. Stillwell Co., 139 U. S. 199, 206, 11 Sup. Ct. 500, 35 L. Ed. 147; New Market Co. v. Embry, 48 S. W. 980, 20 Ky. Law Rep. 1130.

But counsel for defendant in error say that Lillard Bros. do not aver that slop was not furnished, and only claim damages because the feeding lot was not divided into pens and supplied with sufficient and suitable troughs, tubs, tanks, etc. But if the slop was not delivered in the manner contemplated under the contract, but in such way as that it could not be advantageously fed, the damages consequent are of the same kind as if there had been a breach as to the quantity or quality. A delivery in the way contemplated by the prevailing custom was as much a part of the contract as the furnishing of the slop itself.

But it is said that these special damages might have been prevented if the defendants had themselves divided the lot into pens and put in proper lead and feeding troughs, tubs, tanks, etc., and that it was their duty to save themselves from the large losses they now sue for when they might have done these things at comparatively small cost. When a contract has been breached the party entitled to its benefit must use reasonable exertions to save himself from the loss arising, and can charge the other party only with such damages as he could not, with reasonable expense and exertion, prevent. Lawrence v. Porter, 63 Fed. 63, 65, 11 C. C. A. 27, 26 L. R. A. 167; Warren v. Stoddart, 105 U. S. 224, 26 L. Ed. 1117; Wicker v. Hoppock, 6 Wall. 94, 99, 18 L. Ed. 752. In case the contract breached is one of bargain and sale, the rule of damages for a breach by the seller is the difference between the contract and market price, for the buyer can indemnify himself by going into the market and supplying himself, if there is a market for the commodity. Lawrence v. Porter, cited above. But where the contract is of a different description the duty of the party entitled to the benefit of the contract in respect to a course calculated to mitigate his loss must depend upon circumstances. The burden of proving that the damages which have been sustained in such cases could have been prevented rests upon the party guilty of the breach of contract. Costigan v. The M. & H. R. Co., 2 Denio, 609, 43 Am. Dec. 758; Hamilton v. McPherson, 28 N. Y. 72, 77, 84 Am. Dec. 330. In the case at bar it is

insisted that the defendants should have adapted the feeding lot for the proper feeding of cattle with slop by proper subdivisions, lead and feed troughs, etc., and charged same to plaintiff, or sold the cattle and sued for the loss.    But these suggestions entirely overlook the averment of the counterclaim that, when notified of the condition of matters, the plaintiff repeatedly promised to perform their contract, and remedy the matter complained of, and that in reliance upon these promises they continued to feed their cattle as best they could, but that it was 12 weeks before these promises were kept.    Thus it appears that the repeated promises made by the plaintiff, and the reliance of defendants upon those promises, have resulted in enlarging the injury they have suffered beyond their probable loss if they had disregarded such promises and taken a different course to save themselves.    That the defendants should now have their complaint dismissed because the damages suffered are greater than they would have been if defendants had not credulously accepted the assurances of the plaintiff itself would be a crying injustice.    It may be that defendants relied upon plaintiff's promises unreasonably long, and that they should not, therefore, be permitted to recover such part of their loss as should have been prevented. That will be a question upon the evidence.    Upon the averments of the counterclaim there is no rational ground for saying that the entire special damage sustained should have been prevented.    But assuming that defendants have suffered a greater loss than they reasonably should by reliance upon plaintitiff's promises, they certainly are not by that course precluded from recovering such damages as were sustained before they were bound to make the requisite changes themselves.    Plaintiff can only escape such part of the damages as should have been prevented, and the burden is upon it to show what the damages are which it was the duty of plaintiff, under the facts, to have prevented.

As the demurrer went to all the damages, it was too broad, and should have been overruled.

Reverse, with direction to overrule the demurrer, with leave to plead.


Following will be found the opinion of the court below (COCHRAN, District Judge):

This is an action to recover $10,140, the purchase price of slop made from 1,200 bushels of grain at the Cedar Brook Distillery in Anderson county, Ky., each day it ran between December 25, 1902, and May 25, 1903, delivered under a written contract of sale between the plaintiff and the defendants dated November 19, 1902, and set forth in full in the petition. The delivery was on a lot adjacent to, if not adjoining, said distillery, where it was fed by defendants to cattle owned by them. An answer and counterclaim has been filed by defendants. It consists of two paragraphs, the second of which contains the counterclaim. It is, in substance, that said contract of sale does not contain the entire contract between the plaintiff and defendants entered into at the time said writing was executed; that a lease of said lot made by the defendant W. F. Lillard to Julius Kessler & Co., a corporation, dated November 18, 1902, and referred to in the contract of sale, a certain usage in the case of similar contracts between distillers and cattle men as to the action of the distillers, and a verbal agreement between plaintiff and defendants formed a part of said contract and with said contract of sale constituted the entire contract between them; that by said contract as thus made up plaintiff agreed to divide said lot by suitable fencing into not less than five pens for the separation of the cattle into groups, and to provide a lead trough with suitable

falls and connections running through the pens longitudinally, and other suitable troughs and tanks or tubs for the distribution and storing of the slop; that the plaintiff failed to comply with its contract in this particular, and that by reason of such failure 67 head of cattle died from starvation, crowding, and other casualties, to defendants' damage in the sum of $2,166.78; 1,340 head did not fatten as they would have to the extent of 115 pounds per head, and did not sell for as much otherwise as they would have to the extent of 75 cents per 100 pounds, to their damage on the one account in the sum of $6,540.25 and on the other in the sum of $9,115.20; and they were compelled to furnish extra hands to care for and look after the cattle and additional feed, to wit, oil seed meal and hay, to their damage on account of the hands in the sum of $100 and on account of the feed in the sum of $1,820—making a total damage of $19,751.23. The plaintiff has filed demurrers to said pleadings and motions to elect and strike out. The demurrers are to certain portions of each paragraph and to each paragraph as a whole. I do not think that a demurrer to a portion of a paragraph of a pleading is correct practice. If any portion thereof is improper, it should be reached by a motion to strike out. But, whether so or not, it is in order first to inquire whether the demurrer to each paragraph as a whole is well taken as to both or either paragraph. If so, it will be unnecessary to inquire further in regard to the propriety of any particular portions of said paragraphs. The disposition of the motions to elect and strike out should abide the disposition of such demurrers also.

And first, as to the second paragraph, setting forth the counterclaim. The contract of sale dated November 19, 1902, certainly contains no such agreement on plaintiff's part as defendants rely on. There is no reference in it whatever to the matter of fencing. It provides that the plaintiff will deliver and the defendants receive and accept the slop at said lot, referred to as "the feeding lot recently leased from W. F. Lillard near Cedar Brook Distillery," and that defendants should have the privilege of using the "necessary troughs and tubs" which the plaintiff "is to place" in said lot. In the Imperial Dictionary it is said that the word " 'is' forms with the infinitive a particular future tense, which often expresses duty, necessity, or purpose." Here it does not express necessity. Nor can it be said to express duty, as the clause confers on defendants a privilege, and not a right, which is the correlative of duty. It must, then, express purpose. It is the privilege of using the necessary troughs and tubs which it is the purpose of plaintiff to place in said lot that is conferred on defendants. There is no other provision in said contract of sale making any reference to said lot, or to troughs, tubs, or tanks.

Then as to the lease dated November 18, 1902. Two questions arise in this connection. One is as to whether, under the allegations of defendants' pleading, said lease can be read in connection with said contract of sale as forming a part of the contract between plaintiff and defendants. The conditions under which two or more writings can be read together as constituting one contract are thus stated by Mr. Justice Clifford in the case of Bailey v. H. & St. J. R. R. Co., 17 Wall. 96, 21 L. Ed. 611: "It is well-settled law that several writings executed between the same parties substantially at the same time, and relating to the same subject-matter, can be read together as forming parts of one transaction." According to this, three things are essential: (1) The writings must be "between the same parties"; (2) they must have been executed "substantially at the same time"; (3) they must relate "to the same subject-matter." Further on in the opinion he says that it must appear also "that the several writings are parts of a single transaction, either from the writings themselves or by extrinsic evidence; as it may be that the same parties have had more than one transaction in one day of the same general nature." It is alleged by the defendants in their pleading that the two writings in question were executed as parts of one and the same transaction. This allegation must be accepted as true on the demurrer. It may be assumed also that they were executed substantially at the same time, and that in part at least they relate to the same subject-matter. But on their face they are not between the same parties. The contract of sale is between plaintiff and defendants; the lease between W. F. Lillard, one of the defendants, and Julius Kessler & Co., a corporation. The plaintiff and the defendant R. H. Lillard

are not parties to the lease. In order to connect plaintiff therewith, defendants allege that for all intents and purposes concerning the management and operation of said distillery and said lease plaintiff and said Kessler & Co. were one and the same person. Whatever this may mean, it cannot be true. Plaintiff and Julius Kessler & Co. are two distinct corporations or legal persons. There is no such thing as a mystical union of distinct persons in law, however it may be in theology. Defendants, however, allege further the said Kessler & Co. held and operated said distillery and carried on the business connected with it in trust for plaintiff, and without any beneficial interest therein, and that said lease to it from the defendant W. F. Lillard was for its use and benefit. This is the sole fact alleged to make these two writings between the same parties and thus comply with this condition of reading them together as one contract. The only ground, therefore, on which it can be said that they are between the same parties, is that plaintiff, the cestui que trust, is bound by the agreements contained in the lease made by Kessler & Co., the trustee, and that the defendant R. H. Lillard, equally with the defendant W. F. Lillard, is entitled to the benefit of said agreements by virtue of some provision in the lease. Assuming that this is good ground for so saying, we proceed to a consideration of the other question referred to above. That question is whether the lease contains an agreement on the part of Kessler & Co. to do that which it is alleged in the counterclaim plaintiff agreed to do. By that writing the defendant W. F. Lillard leased to Kessler & Co. said lot to be used as a cattle feeding lot for the term of 10 years, with the privilege of an additional 10 years at an annual rental of $250 per year, payable July 1st in each year, with the right to lay pipes upon it and build such sheds and houses for storage of forage as it might deem necessary in the conduct of said business. It provided that said lot should be inclosed by a lawful fence, at the expense of said defendant, who was to keep same in repair during the continuance of the lease, but all inside or partition fences should be built at the expense of and maintained solely by Kessler & Co.; that said defendant, or the defendant Roger H. Lillard, or the firm of Lillard Bros., composed of both defendants, should have the refusal of the slop made at said distillery at the market price for the season in which this privilege was exercised—that is, at the price paid for other slop to be fed under similar conditions; that in case of the transfer of said lot by the death of said W. F. Lillard or other unavoidable cause said R. H. Lillard should not be entitled to the refusal of the slop; that whenever Kessler & Co. furnished slop to be fed upon said lot by either of said Lillards, or both, or any firm or corporation in which they or either of them were interested, no rent should be paid for said lot by Kessler & Co. for the year in which cattle were fed thereon, unless it was furnished to said R. H. Lillard after the transfer of said lot, in which event rent was to be paid; that whenever the distillery was not operated during the distilling season no rent was to be paid, and the lessor was to have the right to cultivate the land; that, should the slop be fed by other parties than the defendants, all stock was to be removed from the lot within five days from suspension of the distillery for the season; and that said Kessler & Co. should have the right to remove from said lot all pipes, fixtures, buildings, and material which it might place therein during the continuance of the lease, provided it should be removed within sixty days after the expiration of the lease. Such, substantially, are the provisions of the lease. There is no agreement in it on the part of Kessler & Co. to do anything to the lot, or to place anything upon it. There is no provision whatever in relation to any troughs, tanks, or tubs. There is the provision as to placing pipes and sheds and houses for storage of forage on the lot, but this confers simply a privilege upon Kessler & Co. to place them there. It imposes no duty upon them so to do. There is the provision also in regard to building inside or partition fences. This provision, however, is not that Kessler & Co. shall build any inside or partition fences, but that all such fencing shall be built and maintained at their expense. Its purpose was to relieve the lessor of any possible duty as to building and maintaining any such fencing, or from being at any expense on account of it, and not to impose any duty on Kessler & Co.; and it was no doubt suggested by the express provision that the lessor was to be at the expense of erecting and maintaining

the outside fencing. It follows from this consideration of the terms of the lease that it contains no agreement whatever on the part of Kessler & Co. to divide the lot into cattle pens by suitable fencing or to furnish any troughs, tanks, or tubs.

How, then, as to the usage and verbal agreement? Defendants allege that in the business of furnishing distillery slop to cattlemen with which to feed their cattle it is the usage, under the conditions similar to those existing in this case, for the distillers to divide the feeding lots into suitable cattle pens by suitable fencing, and to provide suitable troughs and tanks or tubs for distributing and storing the slop, and that in this case at the time of the execution of the contract of sale and lease plaintiff agreed verbally to divide the feeding lot in question into five cattle pens by suitable fencing, and to provide a lead trough with suitable falls and connections running through the pens longitudinally. I understand that the defendants are relying on the verbal agreement as to the number of cattle pens and the lead trough and the usage as to the other troughs and tanks or tubs, the usage being made definite in the former particulars by the verbal agreement. In order for the defendants to avail themselves of this alleged usage and verbal agreement as the basis of their counterclaims, it is essential that this should be a case where parol evidence of usage and verbal agreement is admissible. The rule as to the admissibility of such evidence is alike in both cases. The general rule on the subject is that parol evidence of usage or verbal agreement is not admissible to add to, vary, or contradict the terms of a written contract. In the following decisions by the Supreme Court of the United States this rule was applied as to parol evidence of a verbal agreement: Richardson v. Hardwick, 106 U. S. 252, 1 Sup. Ct. 213, 27 L. Ed. 145; Seitz v. Brewers' M. Co., 141 U. S. 510, 12 Sup. Ct. 46, 35 L. Ed. 837; Culver v. Wilkinson, 145 U. S. 205, 12 Sup. Ct. 832, 36 L. Ed. 676; Van Winkle & Co. v. Crowell, 146 U. S. 42, 13 Sup. Ct. 18, 36 L. Ed. 880. In the following decisions of said court it was applied as to parol evidence of an alleged usage: Oelricks v. Ford, 23 How. 49, 16 L. Ed. 534; Orient Ins. Co. v. Wright, 1 Wall. 470, 17 L. Ed. 505; Thompson v. Riggs, 5 Wall. 663, 18 L. Ed. 704; Barnard v. Kellogg, 10 Wall. 383, 19 L. Ed. 987; Stagg v. Conn. Mut. Ins. Co., 10 Wall. 589, 19 L. Ed. 1038; The Delaware, 14 Wall. 579, 20 L. Ed. 779; Partridge v. Ins. Co., 15 Wall. 573, 21 L. Ed. 229; Hearne v. Ins. Co., 20 Wall. 488, 22 L. Ed. 395; Nat. Sav. Bank v. Ward, 100 U. S. 195, 25 L. Ed. 621; Tilley v. City of Chicago, 103 U. S. 155, 26 L. Ed. 374; Grace v. Am. Ins. Co., 109 U. S. 278, 3 Sup. Ct. 207, 27 L. Ed. 932; Meissner v. Brun, 128 U. S. 474, 9 Sup. Ct. 139, 32 L. Ed. 496. In the case of Partridge v. Ins. Co., Mr. Justice Miller, in referring to the parol evidence offered therein, said: "It appears to us that the testimony offered would have established a new and distinct term to the contract. It would have established a contract very different from the written one introduced by plaintiff. The language of the latter was neither ambiguous nor technical. It required and needed no expert, no usage, to discover its meaning. To have admitted the usage offered in evidence in the case would have been to make a contract for the parties differing materially from the written one under which they had both acted for some time." And in referring generally to the cases where parol evidence of usage is admissible he said: "But when it is sought to extend the doctrine beyond this, and incorporate the custom on to an express contract whose terms are reduced to writing and are expressed in language neither technical nor ambiguous, and therefore needing no such aid in its construction, it amounts to establishing the principle that a custom may add to or vary or contradict the well-expressed intention of the parties made in the writing. No such extension of the doctrine is consistent either with authority or with the principles which govern the law of contracts." And in the case of The Delaware, Mr. Justice Clifford said: "Evidence of usage is admissible in mercantile contracts to prove that the words in which the contract is expressed in the particular trade to which the contract refers are used in a particular sense, and different from the sense which they ordinarily import; and it is also admissible in certain cases for the purpose of annexing incidents to the contract in matters upon which the contract is silent, but it is never admitted to make a contract or to add a new element to the terms of a contract previously made by the parties. Such

evidence may be introduced to explain what is ambiguous, but it is never admissible to vary or contradict what is plain. Evidence of the kind may be admitted for the purpose of defining what is uncertain, but it is never properly admitted to alter a general rule of law, nor to make the legal rights or liabilities of the parties other or different from what they are at common law." It will be noted that Mr. Justice Clifford in the above quotation refers to an exception to the rule against parol evidence when he says that such evidence of usage is admissible in certain cases "for the purpose of annexing incidents to the contract in matters upon which the contract is silent." It may be well, perhaps, for the purposes of this case to ascertain the exact meaning of this exception. An application of it will be found in the previous case of Robinson v. U. S., 13 Wall. 363, 20 L. Ed. 653. That case was an action to recover damages for nondelivery of barley under a written contract. The contract was silent as to whether the barley was to be delivered in bulk or in sacks. It was tendered in bulk and refused. In justification of the refusal it was proven by parol that it was, and always had been, the usage at the place where the contract was made and to be performed to deliver grain in sacks. Such evidence was held to be admissible. Mr. Justice Davis said: "The contract, by its terms, is silent as to the mode of delivery, and, although there are two modes in which this can be done, yet they are essentially different, and one or the other, and not both, must have been in the mind of the parties at the time the agreement was entered into. In the absence of an express direction on the subject, extrinsic evidence must of necessity be resorted to in order to find out which mode was adopted by the parties; and what extrinsic evidence is better to ascertain this than that of usage? If a person of a particular occupation in a certain place makes an agreement by virtue of which something is to be done in that place, and this is uniformly done in a certain way by persons of the same occupation in the same place, it is but reasonable to assume that the parties contracting about it and specifying no means of doing it different from the ordinary one, mean that the ordinary one, and no other, should be followed. Parties who contract on a subject-matter concerning which known usages prevail by implication incorporate them into their agreement if nothing is said to the contrary. The evidence in the present case did not tend to contradict the contract, but to define its meaning on an important point, where, by its written terms, it was left undefined. This, it is settled, may be done." The parol evidence of the usage in that case was for the purpose of annexing an incident to the contract in a matter upon which it is silent, and it was on this ground that it was held to be admissible. But this is not the only instance where parol evidence of usage or verbal agreement is admissible on the ground of silence in the contract. Another instance is referred to in the following statement of Judge Wallace in the case of Sun Printing & Publishing Ass'n v. Edwards, 113 Fed. 445, 51 C. C. A. 279, to-wit: "When the writing is of a nature to import that it was not intended to embody the entire contract between parties, oral evidence to prove the whole terms is admissible. An example of such a writing is a memorandum of purchase or sale." Possibly, also, Judge Lurton has this instance in mind when he says in the case of Dennis v. Slyfield, 117 Fed. 474, 54 C. C. A. 520: "There may be instances in which a contract is partly in writing and partly oral, and the two together constitute the contract, so there may be a question of facts as to whether the written agreement is or is not the entire agreement. Illustrations of such cases are afforded by the cases of Railway Co. v. Jurey, 111 U. S. 584, 4 Sup. Ct. 566, 28 L. Ed. 527, and Bank v. Cooper, 137 U. S. 473, 11 Sup. Ct. 160, 34 L. Ed. 759, where the question was whether a bill of lading constituted the entire contract." Judge Wallace's statement of this instance, however, is not broad enough to cover all cases coming within it. He limits it to cases where it is the nature of the writing to import that it was not intended to embody the entire contract. It covers all cases where the writing so imports, whether such is the nature of the particular writing or not. But the essential condition of this instance of said exception is that the writing so imports. If it does not so import, parol evidence is not admissible to add a term to the contract by usage or verbal agreement merely because the writing is silent as to such term. The necessity of its existence was emphasized in the case of Seitz v. Brewers' Ref. M. Co.,

o

*supra.* That was an action on a written contract to recover the purchase price of a refrigerating machine. The defendant set up by way of defense and counterclaim a contemporaneous verbal guaranty that the machine had a certain capacity, and would accomplish a certain result. It was decided that parol evidence of such agreement was inadmissible. Mr. Chief Justice Fuller said: "Undoubtedly, the existence of a separate oral agreement as to any matter on which the written contract is silent, and which is not inconsistent with its terms, may be proved by parol, if under the circumstances of the particular case it may properly be inferred that the parties did not intend the written paper to be a complete and final statement of the whole transaction between them. But such an agreement must not only be collateral, but must relate to a subject distinct from that to which the written contract applies; that is, it must not be so closely connected with the principal transaction as to form part and parcel of it. And when the writing itself upon its face is couched in such terms as import a complete legal obligation without any uncertainty as to the object or extent of the engagement, it is conclusively presumed that the whole engagement of the parties and the extent and manner of their undertaking was reduced to writing." And again he says: "Whether the written contract fully expressed the terms of the agreement was a question for the court, and, since it was in this instance complete and perfect on its face, without ambiguity, and embracing the whole subject-matter, it obviously could not be determined to be less comprehensive than it was. And this conclusion is unaffected by the fact that it did not allude to the capacity of the particular machine. To hold that mere silence opened the door to parol evidence in that regard would be to beg the whole question."

We are now in position to apply this general rule as to the inadmissibility of parol evidence of verbal agreement or usage to add to or vary or contradict a written contract and this exception thereto to the case in hand. We have here two writings, a lease and a contract of sale. They purport on their face to be separate transactions, and not parts of one transaction. They bear different dates, the one of later date referring to the one of earlier date as a completed transaction, and they are between different parties. But, as stated, it is alleged that they are parts of one transaction, and for the purposes of the demurrers we have assumed that this allegation must be accepted as true. This aside for the present, however, and treating in connection with the matter now in hand the two writings as separate transactions, as they on their faces purport to be, what result have we? And, first, as to the lease. Possibly the defendant W. F. Lillard, the lessor, and perhaps, also, the defendant R. H. Lillard jointly with the former, would have been entitled to the slop for the season in question at the market price as against Julius Kessler & Co., the trustee, and possibly, also, as against the plaintiff, the cestui que trust, under the lease alone, without any further contract on the subject. It may be said that it did not contemplate any subsequent contract in relation to the slop between those parties, or any of them, but only a notification that the slop would be taken at the market price. But if it be conceded that it did contemplate such a contract, the lease was certainly a complete contract in and of itself otherwise. There is no reason for inferring therefrom that the parties thereto did not intend the lease to be a complete and final statement of the whole of that transaction between them with this possible exception, otherwise the lease does not import that it was not intended to embody the entire contract between said parties. This being so, parol evidence of usage or verbal agreement is not admissible to add to it the agreement relied on as a basis of the counterclaim on the ground that the lease is silent in regard thereto. But the lease is not entirely silent as to the matters covered by said alleged agreement. It is silent as to troughs and tanks or tubs. It is not silent as to inside or partition fences. To admit the parol evidence in question would be to vary the provision in regard thereto from a stipulation that the lessee, Kessler & Co., was to bear the expense of building and maintaining such fencing to a stipulation that said lessee was to divide the feeding lot by suitable inside or partition fencing into five cattle pens. Then as to the contract of sale, though it may not have been contemplated by the lease, it served a purpose in addition to any that was served by the lease. It limited the quantity of slop to be furnished to that obtained from 1,200 bushels of grain,

fixed the price, and added plaintiff, the cestui que trust, as an express party to the contract. On its face it purports to be a complete contract. It cannot be inferred from its terms that the parties thereto did not intend it to be a complete and final statement of the whole of that transaction. It does not import that it was not intended to embody the entire contract. But it may be said that the contract is silent as to the mode of delivery of the slop, and therefore, under the authority of the case of Robinson v. U. S., supra, the parol evidence in question was admissible. But an agreement in regard to the fencing has nothing to do with the delivery of the slop. It is not a mode of its delivery. All that plaintiff was to do by the contract was to deliver the slop at the lot, and the defendants were to accept it there. There was no agreement on plaintiff's part to feed the slop to the defendants' cattle. Then as to providing troughs, tanks, or tubs. Though there is more reason, perhaps, for saying that furnishing such articles has something to do with the delivery of the slop than the division of the lot into cattle pens, the contract is not silent in regard thereto. To admit the parol evidence in question would be to vary the stipulation that the defendants were to have the privilege of using the necessary troughs and tubs which it was the purpose of plaintiff to place in the lot to a stipulation that plaintiff was to furnish all the troughs and tubs which defendants should need in feeding their cattle.

The result, then, of our consideration of the two writings as separate transactions, is that it must be held that the parol evidence in question is inadmissible. Considering them as parts of one transaction cannot result differently. The only effect of doing so is to render the lease complete in the only particular in which it is possible to say that it was incomplete. In other words, the lease contemplated that, if the defendants exercised the privilege conferred by it of taking the slop, then a contract would be made in relation thereto, and in pursuance to this forward look of the lease the contract of sale was executed. Reading them together, fits them together, and makes a complete transaction.

Counsel for defendants cite a number of authorities bearing on the question of the admissibility of parol evidence of usage, and quote general expressions therefrom. The decisions of the Supreme Court of the United States, which are binding upon me, cover the ground so completely that I have not found it necessary to consider these authorities carefully, in order that I might point out wherein they do or do not support the position taken herein. It will be noticed that in some of the decisions of the Supreme Court reference is made to the fact that in some jurisdictions the rule as to admissibility of such evidence is broader than it will allow, and that the tendency of the decisions in that court is to narrow the rule, and restrict its application. For this reason, if none other, it is not helpful to consider the decisions in other jurisdictions when those of the federal jurisdiction are so numerous and explicit.

In reflecting upon the ground thus far covered, it occurs to me to add that the only possible basis for claiming that there was any agreement to do the things set up by defendants is this: The stipulation in the lease in regard to inside and partition fences should be construed to be an agreement not only to bear the expense of building and maintaining such fences, but also an agreement to build and maintain them. If the provision in regard to the defendants' taking the slop made at the distillery had been an absolute agreement on their part to take all the slop so made during the term of the lease at the market price, it could be said that the lease was a complete contract, and no additional contract in regard thereto was in contemplation, and, as defendants had agreed to take all the slop absolutely, the stipulation as to inside or partition fences should be construed as above indicated. But the defendants did not so agree. They stipulated only for the refusal of the slop. The lease contemplated that others than defendants might take the slop. In that contingency defendants would not have any interest whatever in the matter of inside or partition fences. In view of this, the stipulation as to the fences should be construed to mean just what it says, and no more, to wit, that plaintiff is to bear the expense of building and maintaining such fences, leaving it open, in case defendants exercised their privilege, and another contract was made covering the matter, to insert in such contract such stipulation as might be agreed on in regard thereto. But, even if such a construction should be

given to said provision, it relates only to the fencing, and is for necessary fencing, and not for dividing the lot into five cattle pens. And, besides, it must be maintained that plaintiff, who was no party to the lease, was bound by the stipulation—a proposition which we have simply assumed without taking position as to its correctness one way or the other.

But there is another ground of general demurrer to the counterclaim. The damages alleged to have been sustained by the breach of the alleged agreement are specialized into five distinct items, to wit, the death of 67 head of cattle, the failure of the 1,340 head to take on 115 pounds per head, the failure of those head to sell for as much as they would have sold by 75 cents per 100 pounds, the increased expense of labor, and the increased expense of feed. Are defendants, if entitled to recover at all, entitled to recover an account of either element of damage thus alleged? What must now be accepted as the leading case on the subject of measure of damages in breach of contract cases is the recent case of Globe Refining Co. v. Landa Cotton Oil Co., 190 U. S. 540, 23 Sup. Ct. 754, 47 L. Ed. 1171. In that case Mr. Justice Holmes says that: "The parties themselves, expressly or by implication, fix the rule by which the damages are to be measured." The principle for determining what rule the parties have fixed by implication where they have said nothing on the subject he says is "what the parties probably would have said if they had spoken about the matter," or, more definitely, such damages as "it may be fairly presumed he [i. e., the obligor] would have assented to if they had been presented to his mind." And here it is not the damages that he would have assented to for a willful breach, but for a breach that he could not have prevented. That case was an action to recover damages for the non-delivery of oil. And in expressing this last idea Mr. Justice Holmes said: "In the present case the defendant's mill and all its oil might have been burned before the time came for delivery. Such a misfortune would not have been an excuse, although probably it would have prevented performance of the contract. If a contract is broken, the measure of damages generally is the same, whatever the cause of the breach. We have to consider, therefore, what the plaintiff would have been entitled to recover in that case, and that depends on what liability the defendant fairly may be supposed to have assumed consciously, or to have warranted the plaintiff reasonably to suppose that it assumed when the contract was made." The measure of damages, therefore, for plaintiff's breach of its alleged agreement to divide the lot into five cattle pens and to provide troughs and tanks or tubs is such damages as the plaintiff fairly may be supposed to have assumed consciously or to have warranted the defendants reasonably to suppose that it assumed when the contract was made.

What, then, are the damages which the plaintiff fairly may be supposed to have so assumed or to have warranted the defendants reasonably to suppose it so assumed? Are they the reasonable expenses of so dividing the lot and providing the troughs and tanks or tubs and any loss sustained in the mean-time caused by delay in having them, or the difference between the contract price of the cattle purchased in reliance upon the contract and what they could have been sold at as soon as the breach was known, or the reasonable profits which defendants would have made under the contract assuming them to have sold them as soon as the breach became known, or those claimed by defendants? I do not deem it necessary to go farther than to say that, in my opinion, those damages are not the damages claimed by defendants. The defendants having limited their claim to certain specified damages, none of which they are entitled to recover, their counterclaim is demurrable, even though damages might have been claimed to which they are entitled. This, then, is an additional ground for sustaining the demurrers to the second paragraph.

The defendants cite the case of New Market Co. v. Embry & Co., 48 S. W. 980, 20 Ky. Law Rep. 1130. That, however, was an action to recover damages for the nondelivery of slop under a contract similar to some extent, no doubt, to the one involved in this case after the performance of the contract had been entered upon. I don't think it applicable to this case, which is not an action to recover damages for nondelivery of the slop, but for breach of a side agreement to divide the lots into cattle pens and furnish troughs, tanks, or tubs.

This consideration of the matter of damages suggests the question whether the defendants did not waive the breach of the alleged agreement to divide the lot into cattle pens and furnish troughs and tanks or tubs by going ahead under the contract with the knowledge that it had not been complied with. It is alleged that no other slop could be procured, and plaintiff repeatedly promised to comply with the contract. This may be the reason why defendants went ahead under the contract. But, having done so, can they now complain of the breach? I do not find it necessary to decide this question, but simply refer to it as one of the questions raised by the demurrers.

It remains to consider the demurrer to the first paragraph as a whole. It is certain that it does not allege any affirmative defense to the action. Does it traverse any of the essential facts alleged in the petition? There is a certain denial of the delivery of the slop, but it is not a good denial. It is simply a denial of the delivery of all the slop alleged to have been delivered, and a denial that it was delivered under the terms of the contract as defendants claim it to have been, or in accordance therewith. This is clearly insufficient to make an issue.

For the reasons stated, the demurrers are sustained so far as they apply to each paragraph, and the defendants are given leave to amend. In view of this ruling it is not necessary that I should act on the motion to elect and to strike out.