COLUMBUS, H. V. & T. RY. CO. et al. v. PENNSYLVANIA CO.

(Circuit Court of Appeals, Sixth Circuit.    March 5, 1906.)

No. 1,455.

1. CONTRACTS—CONSTRUCTION—PRACTICAL CONSTRUCTION BY PARTIES IN EXECUTION.

Where two railroad companies, in a succession of contracts in pari materia, all relating to the joint use of terminal property, all of which originally belonged to one company, but which was subsequently added to by the other, in fixing a basis for the division between them of the cost of maintenance, etc., used the terms "wheelage" and "car and engine mileage" indiscriminately, but, in the execution of the contracts from the first, based such a division on wheelage, that construction will be adopted by the courts in determining their rights thereunder.

2. RAILROADS—CONTRACTS FOR TERMINAL FACILITIES.

Two railroad companies entered into a contract for the joint use of a terminal property owned by one, and which was reached only over a short track owned by such company, the use of which was included. The contract provided that, if the business should require it, additional property should be acquired by one or both and included in the joint use so provided for. Subsequently additional property was purchased by the other company, and a new contract was made reciting its purchase in accordance with such provision, and readjusting the rentals and expenses for maintenance accordingly. Still later a further renewal and readjustment was made to meet new conditions. In all provision was made for dividing the cost of maintenance, etc., of the property owned by each on a wheelage basis, or on the basis of the "car and engine mileage use of said property" by the other. *Held*, that such contracts contemplated the joint use of all the property as a whole, and that wheelage was to be computed on all cars and engines passing to such property over the short line, regardless of whether such particular cars or engines actually went upon and used the part of the property which was owned by the other company, especially in view of the fact that the parties acted upon such construction for many years before any question was raised.

Appeal from the Circuit Court of the United States for the Southern District of Ohio.

A. C. Dustin, for appellants.

E. J. Marshall, for appellee.

Before LURTON, SEVERENS, and RICHARDS, Circuit Judges.

SEVERENS, Circuit Judge. This appeal brings before us proceedings had in the court below upon an intervention of the Pennsylvania Company in a suit brought by the Central Trust Company of New York against the appellant railway company to foreclose a mortgage upon its property, in which Monsarrat had been appointed receiver. By leave of the court the Pennsylvania Company filed its petition, and, later on, a second petition, praying for a decree charging the property of the appellant railway company with the future obligations of two contracts made with the petitioner, the first by one of the constituents of that appellant, which is a consolidation of several pre-existing companies, and the other by the appellant, the first dated November 9, 1876, and the second January 1, 1887, relating to the joint use by the parties of certain railway terminal properties at Toledo, and praying also for an accounting upon the matters of the first of those contracts. The appellants filed a joint answer and cross-petition, and subsequently a second joint answer and cross-petition, in which they asked for the protection of the contracts, and for a decree against the Pennsylvania Company under the contract of January 1, 1887. The issues having been made up, the matters involved in the controversy were referred to a master to take testimony and report. Upon the coming in of the master's report, the court dismissed the petition of the Pennsylvania Company, as well as the cross-petition of the appellant railway company. From that decree the railway company and its receiver appeal. There is but a single ultimate question presented by the appeal, and that is one which requires a construction of a paragraph of the contract of January 1, 1887. The earlier

contract of November 9, 1876, and another relating to the same subject and between the same parties, bearing date May 10, 1880, are to be referred to only for the purpose of settling the meaning of the paragraph of the contract of January 1, 1887, above mentioned.

The facts at the bottom of the controversy are these: The Pennsylvania Company, in 1876, held a lease of, and soon thereafter became the owner of, the properties of the Toledo & Woodville Railroad Co., which included a railroad extending from Walbridge five miles in a northwesterly direction into the city of Toledo, where it ended in a rectangular tract of land of some 12 acres, which was used as the terminal of its freight and passenger business. While in the use of these properties as part of its railroad, the Pennsylvania Company on the 9th of November, 1876, entered into an agreement with the Columbus & Toledo Railroad Company, a constituent of the appellant, and which was then building a railroad northerly toward the city of Toledo, for the joint use and occupation of the short piece of trackage in from Walbridge and the terminal facilities afforded on the 12-acre tract. This contract provided for the payment to the Pennsylvania Company by the Columbus & Toledo Railroad Company of a fixed charge of $21,000 per annum, payable in monthly installments, evidently intended as one-half of the annual interest upon the value of the properties appropriated to the joint use of the parties. Then, in respect to the cost of maintenance, of which the Pennsylvania Company retained the direction, it was stipulated that the Columbus & Toledo Railroad Company should bear a proportionate part, "based upon the proportion which the car and engine mileage of that party shall bear to the whole car and engine mileage * * * over the said part of the Toledo & Woodville Railroad between Walbridge and the city of Toledo." The contract suggested that the needs of their joint use might require the acquisition of more space, in which event the parties would purchase jointly, or, if that should not be resolved upon, then either might buy, and, when bought, the property should be appropriated to the joint use upon the conditions of the original appropriation. Upon the making of this contract and the connection of its line at Walbridge by the Columbus & Toledo Railroad Company, the Pennsylvania Company stationed and continued a watch at Walbridge, who kept count of the several cars and engines of the two companies, passing that place to and from the terminal station at Toledo. The monthly bills for maintenance rendered by, and paid to, the Pennsylvania Company were based upon the count of cars and engines thus kept at Walbridge, and this mode of charging and settling for maintenance was practiced by the parties for about 20 years. Finding more room was needed at the terminal, the Columbus & Toledo Railroad Company proposed to the Pennsylvania Company to jointly purchase another 12-acre tract of the same shape lying east of the other; Magnolia street running north and south between. The Pennsylvania Company not acceding to this, the Columbus & Toledo Railroad Company purchased it, and it was thereupon appropriated to the joint use; the Pennsylvania Company assuming the direction of the maintenance thereof. The Columbus & Toledo

Railroad Company built a dock along one side of the tract it had purchased, for the purpose of facilitating the transfer of freight between it and carriers on the Great Lakes. The Pennsylvania Company desired to extend the joint use so as to include the dock, and on May 10, 1880, the parties made a further agreement, whereby the Columbus & Toledo Railroad Company granted in terms to the Pennsylvania Company the privilege of joint use of the tract it had purchased and included the dock. In consideration the Pennsylvania Company agreed to pay a proportion of the interest upon the cost of the tract and the dock improvements, estimated at $226,949, to be determined by "the car and engine mileage use of said property, * * * to be computed on the same basis and in the same manner, as is provided for expenses of maintenance of that part of the second party's railway between Walbridge and Toledo, occupied jointly by the parties hereto under contract dated November 9, 1876"; and further agreed that, "in addition to the said wheelage proportion of interest upon cost as above provided, the said second party shall pay semiannually to the first party its said wheelage proportion of the current taxes and assessments, * * * said wheelage proportioned to be calculated over the same period of time as taxes cover." It is seen that the "said wheelage proportion" refers to an antecedent, wherein the same thing is called "car and engine mileage use," and that in turn refers to the basis of proportion in the contract of 1876 as being identical. We refer to this contract for the purpose not only of showing the indiscriminate use of the two expressions to mean the same thing, but more particularly to show what understanding they continued to have, and with reference to the matters about which they had contracted. The business went on in this way. But in time some of the individual property of each of the parties had been fixed upon the premises owned by the other, which did not belong to the kind employed in maintenance merely, but were of a permanent character; and it was thought desirable that each should become the owner of all of such property as was located on its own land.

Finally, on January 1, 1887, they entered into the contract now in question. This contract begins by reciting that by the agreement of November 9, 1876, the parties stipulated for the "right of joint use of the main and side tracks, engine house, passenger and freight stations and other terminal facilities of the first party (the Pennsylvania Company) at Toledo, and between Toledo and Walbridge," and provided "that in case the business of the parties should require an increase of facilities, the same should be provided," etc., and that in pursuance of that agreement the parties have from time to time built additional tracks and made other improvements upon the properties in question, at a cost of $89,519 to the first party, and at a cost (including the purchase of its tract of land) to the second party of $226,947, and that the first party was granted the right of joint use of the properties of the second party on the wheelage basis by the contract of May 10, 1880; and further reciting that it was deemed for the mutual interest of the parties that each should be the absolute owner of the structures made upon its own land at joint expense.

Then, by the first paragraph, title to the structures was mutually transferred to the respective owners of the land. By the second, the rental to be mutually paid was fixed at a stipulated rate of interest upon the estimated cost of their respective properties. The third and fifth paragraphs (which, with what has already been recited, are all of the contract material to the present controversy) were as follows:

"Third. The amount of capital account of the second party, increased as aforesaid, is hereby declared and agreed to be two hundred and forty-seven thousand forty-six dollars and seventy-one cents (247,046.71) on which interest computed at the rate of seven per cent. per annum is seventeen thousand two hundred and ninety-three dollars and twenty-seven cents ($17,293.27); of which last named sum the first party will pay monthly to the second party such proportion as shall be determined by the car and engine mileage use of said property made by said first party, the same to be computed on the same basis and in the same manner as is provided for expenses of maintenance of that part of the first party's railway between Walbridge and Toledo, occupied jointly by the parties hereto under said agreement of November 9, 1876. In addition to the above, the first party will also pay to the second party its wheelage proportion of current taxes and assessments, which may be lawfully paid by the second party on said real estate and improvements; said wheelage proportion to be calculated over the same period as the taxes cover, and payments thereof to be semi-annual."

"Fifth. The second party shall have charge of the repairs and maintenance of the tracks and improvements on its own property, and the first party will pay monthly to the second party its wheelage proportion of the cost of such repairs and maintenance."

This agreement is a reconstruction of the original contract of November 9, 1876, adjusted to the changes brought about by the addition of other property and improvements. The basis on which rentals had been calculated had all the while continued substantially the same, and the basis of the contribution of the parties to the cost of maintenance has remained the same in each of their several contracts.

What is especially significant is the fact that no account was kept of the cars and engine of the Pennsylvania Company which used the tracks and facilities of the Columbus & Toledo Company, or of those of the appellant; the only account kept being, as already stated, of such of its cars and engines as used any part of the terminals by whomsoever owned. But in 1897 the Pennsylvania Company, being advised that the contract of November 9, 1887, contemplated payment of the cost of maintenance by the parties on the basis of the mileage of their several cars and engines passing between Walbridge and Toledo, and using the property of the other owner, and that the Pennsylvania Company was therefore not to be charged on account of cars and engines passing over its own property, but not over the property of the appellant, refused to go on with the previous practice of counting all its cars and engines passing in and out over the railroad between Walbridge and Toledo, but continued to pay for all cars which passed over the property of the appellant, upon the understanding that the payment of the balance of the bills should remain for future adjustment or judicial determination. For the period here involved, these balances amount in the total to $49,356.69, with interest from the time when they severally became due.

The counsel on both sides agree that the whole controversy turns upon the construction which should be given to the third paragraph of the last contract. Counsel for the appellant contends that the basis of the apportionment of the cost of maintenance is the number of cars and engines which pass over the short piece of railroad into the terminal, or out of the latter over the piece of railroad; and that it is not material whether such cars or engines pass into the property owned by the appellant. Counsel for the appellee contends that the basis is the mileage which the cars and engines severally run, and that this means run upon a route some part of which belongs to the other party; and that, as we gather, the use of the word "mileage" indicates a purpose to connect the mileage with the property over which it is accomplished. But his principal contention is that, although the contention of the appellants in respect to the construction of the contract of November 9, 1876, may possibly be held right, and that it was rightly performed by the manner in which the proper proportions of cost of maintenance was ascertained and settled, yet, upon the acquisition of the eastern tract by the Columbus & Toledo Railroad Company, new conditions were brought about, so that, while that company would always be obliged to use the Pennsylvania Company's premises in coming in or going out, the Pennsylvania Company would not always, or perhaps generally, use the premises of the other company at all.

We think the counsel for the appellants lay too much stress upon the wording of the stipulations of the contracts in respect to the basis of apportionment of the cost of maintenance, whether it be one of mileage or of wheelage. But the solution of that question has some bearing upon the question of the amount due, though it could not largely affect it. We are satisfied that the parties all along intended the proportions to be settled upon the basis of wheelage; that is, by the number of cars using the facilities provided for the joint use of the parties. This not so clearly upon the unaided construction of the language of the contract of 1876, to which the contract of 1887 refers, for that, when applied to its subject-matter, raises grave doubt of its meaning, but because of the construction, which the parties during so many years of operation under the contract, put upon it. This is a very safe guide in cases of doubt in finding the intention of parties. Their concurrent action in taking up the execution of their contract, while their minds were still conscious of the understanding they had when making it and pursuing its execution without question, may, with confidence, be relied upon as indicating what they meant when they made it. This is a familiar rule of construction. We may cite a case which has a two-fold application to the present, in that it also states the rule applicable when the parties have made successive contracts in pari materia—the case of Chicago v. Sheldon, 9 Wall. 54, 19 L. Ed. 594, where Mr. Justice Nelson said that in an executory contract where "its execution necessarily involves a practical construction, if the minds of both parties concur, there can be no great danger in the adoption of it by the court as the true one. There is another consideration in the case entitled to

weight in the interpretation of this contract, and that is the language of the contract made between the city and the company in 1864. This ordinance is in pari materia with the one of 1859, and helps to explain any ambiguity in it."

The rule referred to was thus phrased by Judge Sanborn, in delivering the opinion of the Circuit Court of Appeals for the Eighth Circuit, in Manhattan Life Ins. Co. v. Wright, 126 Fed. 82, 61 C. C. A. 138:

"The practical interpretation given to their contracts by the parties to them while they are engaged in their performance, and before any controversy has arisen concerning them, is one of the best indications of their true intent, and courts that adopt and enforce such a construction are not likely to commit serious error."

A case where a contract for the joint use and maintenance of a piece of railroad was construed by the acts of the parties in carrying it out in Chicago G. W. Ry. Co. v. Northern Pac. Ry. Co., 101 Fed. 792, 42 C. C. A. 25.

To the same effect is the statement of the rule in our recent decision in Luhrig Coal Co. v. Jones & Adams (C. C. A.) 141 Fed. 617.

But the really decisive question is whether, in apportioning the cost of maintenance of the property for the joint use, the parties intended to have regard to, and rest their apportionment upon, the use by the respective parties of the particular parts of the premises which they severally owned; or whether, in respect of use, they regarded all parts of the property, whensoever acquired and by whomsover owned, as one whole, so that the use by one party of any part of it counted, whether the part used was actually owned by it or not. And we cannot doubt that the latter is what the parties intended. The language of all the contracts points to this, and the conduct of the parties conforms to it. The acquisition of the second 12-acre tract by the Columbus & Toledo Railroad Company was contemplated by the contract of 1876 as one which the parties anticipated might be necessary for their joint use. The contract of 1887 recites that provision was made in the contract of 1876 "that in case the business of the parties should require an increase of facilities, the same should be furnished in manner therein provided"; and that, "in pursuance of said agreement and of arrangements made from time to time in accordance therewith, * * * the second party [this appellant] bought a large amount of real estate in Toledo * * * of which the first party was granted the joint use * * * by said agreement of May 10, 1880." And the only object the parties had in mentioning it in the contract of 1876 was that it was to be acquired for joint use, for neither party would have occasion to contract about the use of property which the other should independently acquire and separately use, much less to stipulate about the rental of it, the supervision of it, and the sharing of the cost of maintenance. An important circumstance is that the rentals paid by each party for the use of the property of the other is constant and is in no wise affected by the extent of the use they actually make of it.

Counsel for the appellee say in their brief that "the provision in the

contract of 1880 for the division of expense of the Hocking Valley tract was contained in item second of said contract as follows"— quoting that item in full. If by that it is intended to say that that was the only "division of expense" for that tract, as it would seem, it is a mistake. The second item fixed the division of the rental and of "the taxes and assessments." The sixth paragraph was this:

"6. The second party shall have charge of the repairs and maintenance of the tracks on said property, and the first party will pay monthly, to the second party, its wheelage proportion of the cost of such repairs and maintenance, and under this item shall be included the wages of any employés who may be needed in the transaction of the joint business on said property. But the second party shall in no way be charged with the maintenance of the docks on said property, or the fixtures and appurtenances thereto."

By the terms of this agreement the charge of the maintenance of the tracks, which the Pennsylvania Company had exercised on the land owned by it, was extended over the new acquisition. In short, the purchase by the Columbus & Toledo Railroad Company dropped into the place provided for it by the agreement of 1876, and the terms upon which it was appropriated to the common use were, so far as concerned the cost of maintenance, the same as had been provided in the original; and, it may be added, were also the same as in the later contract of 1887. In effect, the business of the two companies was in substance the same as if they had jointly leased from a stranger, instead of from each other, the properties they put to their joint use.

Some minor questions growing out of the extent of the recent use of the properties by the parties are mentioned in the brief of counsel for the appellee, but they are not put in controversy on the present record, and we refrain from considering them.

It is agreed by counsel that the adoption of these views leads to the reversal of the decree and the substitution of a decree in favor of the appellant for the sum of $49,356.69, with interest on the monthly balances of which that sum is composed from the time when they should have been paid.

The decree, in so far as it declares the basis of contribution by the parties to the cost of maintenance to be the number of each car and engine passing on or off the property of the Pennsylvania Company, but which have not used the property of the appellant, and dismisses the cross-petition of the appellant, is reversed, with instructions to render a decree for the appellant for the sum of $49,356.69, with interest as above indicated.