KENTUCKY DISTILLERIES & WAREHOUSE CO. v. LILLARD et al.

(Circuit Court of Appeals, Sixth Circuit. March 18, 1908.)

No. 1,707.

1. APPEAL AND ERROR—EXCEPTIONS, BILL OF—SETTLEMENT—NOTICE—RECORD.
    Notice of the settlement of a bill of exceptions being necessarily given by one counsel to the other would not ordinarily appear in the records of the court.

2. EXCEPTIONS, BILL OF—TIME—EXTENSION—MOTION FOR NEW TRIAL.
    Where a motion for a new trial has been made or some other relief against the judgment which the court has power to grant has been prayed, and the court, instead of dismissing the motion, holds it for further consideration and disposition at a subsequent term, the judgment is not final until the expiration of the term at which the court disposes of the objec-

tions made thereto, and hence a bill of exceptions settled within that term is in time.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 21, Exceptions, Bill of, § 69.]

**3. CONTRACTS—CONTEMPORANEOUS CONSTRUCTION.**

When the construction of a contract is in doubt, the construction which the parties have placed thereon during the course of its execution may be applied.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 11, Contracts, § 753.]

**4. CUSTOMS AND USAGES—PROOF.**

Less distinct and certain proof of the existence of a custom is required when the parties in making their contract apparently have in mind a usage which, if tangible, may not be so old or universal and uniform as it must be to warrant a presumption that the parties knew the custom, and contracted with reference thereto.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 15, Customs and Usages, §§ 41–46.

Presumptions as to customs and usages, see note to Great Western Elevator Co. v. White, 56 C. C. A. 394.]

**5. SAME—FINDINGS—EVIDENCE.**

Evidence *held* to justify a finding that a contract for the sale of distillery slops to be delivered by the distillery company to cattle feeders at the feeding lot, which had been leased to the distilling company, was made subject to a custom or usage requiring such company to equip the feeding lot with pens, troughs, tanks, etc.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 15, Customs and Usages, §§ 41–46.]

**6. SALES—CONSTRUCTION OF CONTRACT—DELIVERY.**

A contract for the sale of distillery slops for feeding provided that the distillery company would sell and deliver, and defendants would purchase, receive, and accept, at the feeding lot recently leased by the distilling company the slop, etc.; and another paragraph declared that defendants should have the privilege of using the necessary troughs and tubs which the distilling company was to place in the feeding lot so leased. *Held*, that such provisions fairly implied a duty on the part of the distilling company to place the tubs, troughs, etc., in a suitable manner for conducting the feeding, and that they should be connected with the tanks and tubs by pipes in the usual manner.

**7. DAMAGES—CONTRACT—BREACH.**

In an action for the price of distillery slops to be used for feeding, defendant counterclaimed that, by reason of plaintiff's failure to furnish the feeding lot with sheds, tanks, troughs, pipes, division fences and other facilities for feeding cattle therein, defendant's cattle to the number of 1,100 had greatly suffered from hunger, exposure, and disease, from which many of them died, and the rest were much diminished in weight and value from what they would have been if the lot had been properly equipped. There was evidence that 67 of the cattle had died from starvation and from crowding in great numbers around the few troughs that had been furnished, and of their value. It was also shown that, 1,340 failed to fatten to the extent they might reasonably be expected to do, with evidence of such extent, and that these cattle became thin and poor and could not be sold for more than 75 cents per hundred pounds less than if they had attained the condition they would have attained under conditions required by the contract, and that extra time and labor was necessary and bestowed, and that extra feed had been supplied to save the failing animals. *Held*, that such damage was not objectionable, as either speculative or remote.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 15, Damages, §§ 65–70.]

**8. SAME—EXCESSIVENESS.**

A verdict for defendants on such counterclaim for $7,000 was not so grossly excessive as to permit a court of review to interfere.

**9. SAME—DUTY TO MITIGATE DAMAGES.**

Where a distilling company under a cattle-feeding contract was bound to construct certain furnishings and fittings in the feeding lot, but failed to do so, the cattle owner was excused from himself providing such furnishings in order to mitigate his damages by the distilling company's repeated promises to remedy its neglect, so long as the cattle owner had ground to expect that such promises would be fulfilled.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 15, Damages, §§ 124–132.]

In Error to the Circuit Court of the United States for the Eastern District of Kentucky.

Wm. M. Bullitt, for plaintiff in error.

L. C. Willis and T. L. Edelen, for defendants in error.

Before LURTON, SEVERENS, and RICHARDS, Circuit Judges.

SEVERENS, Circuit Judge. The plaintiff in this cause brought suit to recover the balance due from the defendants on a contract for supplying them with slops from its distillery, for cattle feeding. The defendants admitted the execution of the contract, and that the slops had, in a way, been supplied; but advanced a counterclaim based on allegations that the plaintiff had not made such delivery as it was bound to do by the terms of the contract, and had otherwise failed to perform its stipulations; for which they demanded damages, to be offset against the demand of the plaintiff, to the extent of its demand, and a judgment for the overplus. This counterclaim was rested upon the ground that the plaintiff was to furnish the feeding lot with sheds, tanks, troughs, pipes, division fences, and other facilities for feeding cattle in it, which it had failed to do; and that in consequence of this neglect their cattle, to the number of about 1,100, had greatly suffered from hunger, exposure, and disease, from which many of them died, and the rest much diminished in weight and value from what they would have been if the feeding lot had been properly equipped. The plaintiff demurred to the counterclaim, and the demurrer was sustained. The defendants declining to plead further, final judgment was entered, and the defendants brought the record here for review on a writ of error. The judgment was reversed. 134 Fed. 168, 67 C. C. A. 74. The parties pleaded to issues on the merits. A trial thereon by a jury has been had, resulting in the establishment of the counterclaim by a verdict and judgment for the defendants for the sum of $7,000; and the case is now brought here by the plaintiff. Counsel for defendants make a preliminary objection to the bill of exceptions, and move to strike it from the record. The objection is a serious one, because the bill of exceptions is indispensable to any effective review of the rulings of the court below.

The facts on which the motion is made are these: A judgment in favor of the defendants for $7,000 was entered in the usual form on October 4, 1905. On the following day, the court being still in session, the plaintiff entered a motion for a new trial, and the entry on the journal was "the court not being sufficiently advised on said motion takes

time." The court thereupon assigned the motion for argument on the 3d day of April, 1906. The motion was argued by counsel for both parties at a session of the court at Covington, before the commencement of the next term at Frankfort where this cause was pending. The next term of the court at that place passed without any proceedings in this cause; and nothing further was done until February 27, 1907, when an order was entered denying the motion for a new trial, and giving the plaintiff 60 days within which to prepare and file a bill of exceptions. On the 17th of April, 1907, a bill of exception was presented to the court by the plaintiff and was allowed by the judge, and was filed and ordered to be made a part of the record in the cause. And an entry to that effect was made upon the journal of that day. It is stated by counsel for defendants at the bar that the bill was allowed without any notice of its intended settlement, and in vacation. From the record it would seem, however, that the court was in session when the bill was presented, and, on being allowed by the judge, was ordered to be made part of the record, and the record must control. We do not intend any implication that we think a bill of exceptions may not be settled by the judge in vacation. As to whether notice was given of its intended settlement, or whether counsel for plaintiff was present, the record is silent. Inasmuch as the notice if given would pass from counsel for one party to those of the other, it would not ordinarily appear in the records of the court. No motion was made in the court below for amendment of the bill; nor was any complaint made there, nor is there here, that the bill does not truly and fairly represent the proceedings on the trial of the cause. The principal ground on which the motion to strike it out is based is that the court lost control over the case upon the lapse of the term at which the judgment was entered. This is undoubtedly the rule, if at the expiration of the term the judgment continues final. But if a motion for a new trial has been made or some other relief against the judgment which that court has power to grant has been prayed, and the court, instead of dismissing the motion, holds it for further consideration and disposition at a subsequent term, the judgment is not final, but subject to the further action of the court until the expiration of the term at which the court disposes of the objections made to the judgment. It is sufficient to cite the cases of Merchants' Ins. Co. v. Buckner, 98 Fed. 222, 39 C. C. A. 19, a case decided by this court, and the opinion by Judge (now Justice) Day in discussing this subject, and Minahan v. Grand Trunk Western Ry. Co., 138 Fed. 37, 41, 70 C. C. A. 463; citing Ward v. Cochran, 150 U. S. 597, 14 Sup. Ct. 230, 37 L. Ed. 1195. The motion must be denied.

The contract and the pleadings are fully stated in the report of our former decision (134 Fed. 168, 67 C. C. A. 74), to which, to save time and space, we refer for details. Epitomized, the facts are that on November 18, 1902, the plaintiff had a distillery in Anderson county, Ky., the refuse from which it was intended, as is customary, to utilize by feeding it to cattle. The defendants owned a 30-acre lot adjacent to the distillery, and proposed to engage in cattle feeding. And on that day, and the day following, the parties—that is, the distillery company and the Lillards—made two written agreements. By one, the Lillards

leased their lot for the term of 10 years to the company at an annual rental of $250 for the purpose of enabling the company to furnish cattle-feeding grounds to those who would purchase the slops and use the grounds for the feeding. The other was a contract whereby the company agreed to furnish the Lillards with all the slop made from the daily consumption of 1,200 bushels of grain from December 25, 1902, to May 25, 1903, and deliver it at the feeding lot which it was leasing from the Lillards. The principal controversy is over the construction and effect of the stipulation in the contract about the delivery of the slop to the defendants; and more particularly upon the effect of a usage or custom which, as the defendants pleaded, existed in that locality, requiring the seller of slops to furnish to the vendee a feeding lot provided with sheds, tanks, troughs, pipes for delivering the slops to the troughs, and other facilities necessary for the use of the lot for feeding the slop to cattle. And we may remark, in passing, that it was because of the error of the court below in holding that such a custom was repugnant to the express stipulations of the contract we reversed the judgment on the former hearing. Upon the trial which has since been had, the lease and the contract were put in evidence. A considerable number of witnesses were produced by both parties who gave testimony concerning the existence of the usage which the defendants claimed to have existed, and further testimony was given in regard to the fault of the plaintiff in neglecting to furnish the grounds with the facilities for the delivery and feeding of the slop as it was claimed it should have done, and the damages resulting therefrom. Evidence was also given in regard to the failure of the defendants to relieve themselves from the consequences of the neglect of the plaintiff, by themselves procuring and constructing in the yard the required furnishings. Several exceptions were taken by the plaintiff to the rulings of the court upon the trial. But counsel for the plaintiff has brought the questions involved within easy compass by stating them as follows:

"(1) There should have been a peremptory instruction in favor of the Kentucky Company, because the Lillard Bros. did not prove the existence of any custom or usage which required the Kentucky Company, to equip the feeding lot with pens, troughs, tanks, etc. (2) The damages are not sufficiently proven, are too speculative and remote, and the judgment is grossly excessive. (3) Lillard Bros. did not use reasonable exertion to save themselves from the loss arising from the alleged breach of the contract, and therefore they cannot charge the Kentucky Company with damages which with reasonable expense and exertion they could have prevented."

With regard to the first of these questions, it must be taken to be whether there was any evidence having substance and which might reasonably convince the jury of the fact that the alleged custom existed. For neither could the court below, nor could this court, in such circumstances, weigh the evidence in its own balance. If the testimony was pertinent and had significance the jury were the sole judges of its value. Mt. Adams, etc., R. Co. v. Lowery, 74 Fed. 463, 20 C. C. A. 596; Travelers' Insurance Co. v. Randolph, 78 Fed. 754, 24 C. C. A. 305; Minahan v. Grand Trunk Western Ry. Co., supra. To begin with, it appears that the distilling company leased this lot "to be used as a cattle feeding lot," and there was granted to it "the right

to lay upon it pipes and to build sheds and houses for the storage of forage." The defendants were to build an inclosing fence, but it was distinctly understood that all inside or partition fences should be built at the expense of and maintained solely by the company. If the company should furnish slop to defendants, no rent should be paid for that year. The company was given the privilege of removing "all pipes, fixtures, buildings and material which it may place thereon during the continuance of this lease" at its expiration. The lessors were given the refusal during the continuance of the lease to buy the slop at its market price—that is, at the price paid for other slop in Kentucky to be fed in similar conditions. From all this it might be fairly inferred that the company expected to sell its slop to cattle feeders during the time the lease was to run. It contracted to give at all times the refusal to the Lillards of the slop at the market price, and to put in the division fences, and expressly secured the right to lay pipes and build buildings as it might deem necessary in the conduct of said business— that is, the cattle-feeding business. This did not make it obligatory upon the company to build any structure upon the land or do anything else to it, unless perhaps it should sell slop to the Lillards. But it has some significance in showing its understanding that if it should sell slop to cattle feeders, the company would be required to fit up the lot for the business. And there was evidence tending to show that after the contract was made, and after the defendants had brought their cattle into the lot, they called the company's attention to the fact that the furnishings had not been supplied, and that the company, not denying its obligation, repeatedly promised to put them in. Now, as the contract did not expressly require that the company should furnish the fittings, it could only have been moved to recognize its obligation by a knowledge that it was customary for the distiller to do that, and that it would be expected as an incident to the contract. When the construction of a contract is in doubt, the construction which the parties put upon it during the course of its execution is a very safe guide. Columbus, H. V. & T. Ry. Co. v. Pennsylvania Co., 143 Fed. 757, 74 C. C. A. 647. Less distinct and certain proof of the existence of a custom is required when the parties in making their contract apparently have in mind a usage which if tangible may nevertheless be not so old or so universal and uniform as it must be to warrant a presumption that the parties knew the custom and contracted with reference to it. The testimony of the witnesses in regard to the usage in question did not in all respects quite agree, but there was a general trend in the proof that it was usual to expect that in ordinary circumstances—that is, when, as here, the full market price was paid—the seller of the slop would supply the conveniences for feeding, though the rule would be different if the price was diminished to such an extent as to balance the cost of supplying them, in which case the vendee would be expected to supply them. And we think that the proof of the prevalence of such a usage and of the fact that the parties had it in mind in making their contract was sufficient to warrant the jury in giving it effect in their verdict. And, further, it may be observed that there seems room for the application of the rule that when one of the parties knows that the other party understands it to mean something which

is possibly within the range of its terms, the contract shall be taken in that sense. The contract was that the first party "subject to all the terms and conditions hereto will sell and deliver, and second party will purchase, receive and accept at the feeding lot recently leased from W. F. Lillard * * * the slop," etc. This does not define any particular place in the lot. It might mean in the troughs where the cattle were to find it, and if the latter, it might mean that tanks, tubs and pipes would be necessary for its distribution. The fourth paragraph of the contract is that, "second party shall have the privilege of using the necessary troughs and tubs which first party is to place in the feeding lot leased from W. F. Lillard." The necessary tubs and troughs were to be placed in the lot by the company. This would seem fairly to imply that they should be placed in a suitable manner for conducting the feeding, and that they should be connected with the tanks and tubs in such a way as to make them usable, and the usual way was by pipes.

2. It is said that the damages were not sufficiently proven; that they are too speculative and remote; and that the judgment is grossly excessive. This contention is so groundless that it may be dismissed with a few words. There was evidence that 67 of the cattle died from starvation, and from crowding in great numbers around the few troughs, and of their value; that 1,340 failed to fatten, to the extent they might reasonably be expected to do with the quantity of feed fed to them, and the extent was proved; that these cattle became thin and poor, and could not be sold for more than 75 cents per 100 pounds less than if they had attained the condition which would have reasonably been expected if the conditions had been proper; that extra time and labor became necessary and was bestowed; and that extra feed had to be supplied to keep up the failing animals and save them. From the testimony shown in the record, we think the jury might have given the defendants a larger verdict than they did. And the damages were not remote. They were the natural and probable result of conditions for which the plaintiff was responsible. If the damages seem large, they are not, so far as we are permitted to judge, out of proportion to the fault.

3. In substance, this allegation of error is that the defendants did not take measures to remedy the fault of the plaintiff by supplying the proper furnishings themselves, and thereby mitigate the damages. The rule of law thus appealed to is certainly well settled. Lawrence v. Porter, 63 Fed. 63, 11 C. C. A. 27, 26 L. R. A. 167; Warren v. Stoddart, 105 U. S. 224, 26 L. Ed. 1117. And the court gave it to the jury; but with the modification, which the evidence suggested, that if the failure of the defendants to take such action was fairly attributable to the circumstances that upon repeated requests the plaintiff promised from time to time to remedy his neglect by putting in the furnishings, such facts would excuse the defendants so long as they had ground for expecting the plaintiff would do its duty. This modification of the rule was also correct. But a party who grounds his complaint upon an allegation that the other party was at fault in confiding in his representations and promises is not entitled to much favor, and the burden is upon him to show, at least, from what time the other should

have abandoned his faith, and set about retrieving his error and minimizing the damages. Lillard v. Kentucky Distilleries, etc., Co., 134 Fed. 178, 67 C. C. A. 74, and the cases there cited. Not only is this burden not sustained, but there is no exception and assignment of error which properly presents any ruling of the Circuit Court upon any other relevant point of law upon this subject which we can review.

The judgment should be affirmed, with costs.