**NEW YORK & CUBA MAIL S. S. CO. et al. v. LAMBORN et al.**

(Circuit Court of Appeals, Second Circuit. July 19, 1926.)

No. 368.

I. Shipping ⬅180—**Shipowner's unreasonable delay in answering request for removal of ship may prevent recovery of demurrage.**

Shipowner's unreasonable delay in answering charterers' request for removal of ship to facilitate loading may prevent collection of demurrage, under rule requiring promisees to take all reasonable measures to minimize loss.

2. Shipping ⬅180.

Delay of shipowner's agent in procuring answer to request for removal of ship to facilitate loading *held* unreasonable, and demurrage for period of delay not recoverable.

3. Shipping ⬅180.

That charterers' agent was misled into supposing that ship would be moved to facilitate loading *held* not to estop shipowner's assertion of claim for demurrage.

4. Shipping ⬅173.

That master indorsed only small claim for demurrage on bill of lading *held* not waiver of claim against charterer for greater amount.

5. Shipping ⬅180—**In libel for demurrage, report of owner's agent held insufficient to show delay in loading, due to master's miscalculation of his draft.**

In libel for demurrage, report of owner's agent that delay in loading was due to master's error in calculating his draft *held* insufficient to establish such fact, as against express oaths of ship's officers.

6. Shipping ⬅184.

That claim for demurrage was first rejected on insufficient excuse of force majeure *held* not a waiver of other defenses.

Appeal from the District Court of the United States for the Southern District of New York.

Libel by the New York & Cuba Mail Steamship Company and others against A. H. Lamborn and others. From a decree for libelants (8 F.[2d] 382), respondents appeal. Decree modified, and, as modified, affirmed.

Appeal from a decree in admiralty of the District Court for the Southern District of New York awarding to the libelant, a shipowner, damages against charterers for demurrage upon two charters for the carriage of sugar.

On January 23, 1920, the parties entered into a charter party for the carriage of 14,-800 bags of sugar by the steamship Manta from the port of Nuevitas, Cuba, to New York or Philadelphia, at 45 cents per 100 pounds. The charterers were allowed lay days for lading at the rate of 5,000 bags per day, "demurrage in loading * * * to be payable by the charterer on the basis of 48 cents United States currency per gross registered tonnage of vessel per day." On the same day the parties entered into a second charter party for the carriage of 2,200 bags of turbinated sugar from Matanzas, Cuba, to New York or Philadelphia. This was on the same form and in the same terms, except that the freight rate was slightly different and the

lay days for lading were to be at the rate of 6,000 bags instead of 5,000.

The Manta reported ready for lading at Pastelillo, which was the port of Nuevitas, on January 26th at 11 a. m. The charterers began to load at 7:45 a. m. on January 27th and continued until 5 p. m. of January 28th, when the Manta had lifted all the sugar then at the Pastelillo pier, 7,794 bags. A strike was impending on the Cuban railroads, and the balance of the sugar was at a warehouse a mile away from the pier at which the Manta lay. Anticipating the impossibility of bringing any more sugar to the pier, the charterer's Havana manager, Ullivarri, about noon on January 28th, asked the owner's freight traffic agent in Havana, Deetjen, to allow the Manta to go to Matanzas and there lift other sugar in place of that at Pastelillo. Deetjen answered that he would look into it. This talk Ullivarri confirmed by letter on the same day, which he concluded with the request that Deetjen should at once telegraph to Nuevitas such instructions. On the 29th the owner's agent at Nuevitas, Carreras, wired Deetjen that the Manta could not load more sugar because of the strike, and asked whether the ship should be dispatched to Matanzas to complete. On the morning of the 30th Deetjen cabled to the owner in New York and got its assent on the morning of the 31st, whereupon he wired Carreras to dispatch the Manta to Matanzas if the shippers were not able to fill. Immediately on receipt of this telegram, Carreras wrote to the pier superintendent at Pastelillo, asking whether it would be impossible for him to fill the ship at that port. This letter arrived on the evening of the 31st, and on the next day the port superintendent answered that he could make no definite statement as to his ability. Carreras thereupon prepared the ship's papers and she sailed at 11:25 a. m. on February 2d, the 1st falling on a Sunday. The Nuevitas demurrage is for the delay from the expiration of the lay days to the time of the ship's sailing.

Arrived at Matanzas, the ship laded 8,947 more bags under both charter parties. The lay days were also exceeded at Matanzas, and the defense is that the extreme fore and after hatches, Nos. 1 and 4, were not loaded equally with Nos. 2 and 3, the midship hatches. It resulted that the completion of hatches 1 and 4 consumed some time, during which not all the ship's winches were at work. The libelant's reply is that the sugar was taken on board as fast as it was offered, that no lighters were kept waiting, and that it was necessary to fill the fore and after hatches last, in order properly to trim the ship. The local agent of the owner at Matanzas, in his loading report, stated that the delay was owing to the master's error in calculating his draft. This the master and other officers denied.

Van Doren, Conklin & McNevin, of New York City (Alfred C. B. McNevin and Randolph Harris, both of New York City, and Edward S. Bentley, of Lawrence, N. Y., of counsel), for appellants.

Burlingham, Veeder, Masten & Fearey, of New York City (John L. Galey, of New York City, of counsel), for appellees.

Before ROGERS, HOUGH, and HAND, Circuit Judges.

HAND, Circuit Judge (after stating the facts as above). [1, 2] The answer pleads an agreement to move the Manta to Matanzas and a breach. That defense wholly broke down on the trial, and if we were disposed to stand upon the pleadings the case would be at an end. However, this suit is in the admiralty, and the variance between the defense as pleaded and that proved does not appear to us fatal. The charterers' only possible excuse is that an owner, being advised that his charterer cannot load within the lay days, ought to grant his request to move the vessel elsewhere, so as to keep the loss as low as possible. This, they argue, arises from the duty of any promisee to take all reasonable measures to minimize the loss.

It does not appear to us to make the slightest difference whether a charter party such as that at bar be regarded as imposing an obligation upon the charterer to load or discharge within the lay days, the demurrage being stipulated damages, or whether the delay be regarded as the charterer's privilege, and the demurrage as hire during the extended period. Nothing in Inverkip S. S. Co. v. Bunge & Co., [1917] 2 K. B. 193, requires one to take the second view, because, even if the charterer's failure be a breach, it need not necessarily justify the owner's repudiation. The owner's duty to minimize the loss may exist equally, though the charterer does not break any promise in failing to load, because the owner in any event recovers upon the promise to pay demurrage, and there is no more reason why his damages on that breach should not be subject to the ordinary rules than if he were suing on the breach of a promise to load. True, when the question arises, the charterer has not yet broken his promise to pay the demurrage, but the loss is inevitable, and the duty of the promisee to reduce it before the time of formal breach

ought to depend upon the same principles as afterwards. In neither case does the law impose a promise on the promisee which he has not undertaken, but in each it controls the remedy, so that he may not recover, even for actual losses which he might reasonably have avoided.

In Stoomvart, etc., Co. v. Lind, 170 F. 918, 96 C. C. A. 134, we declined to apply this rule in a case where the charterer had refused to pay certain expenses of moving the ship in an amount which we thought reasonable. That was certainly correct. Besides, we recognize that there may be difficulties, such as those of insurance and the like, which may in any event justify the owner in declining to move a ship outside the stipulated limits. Any such considerations are entirely absent here, however, because the owner, when asked, at once consented to the move. We did say in Stoomvart, etc., Co. v. Lind that, unless the charterer repudiated the charter party altogether, the owner was not obliged to minimize his loss, apparently on the understanding that the rule was in general so limited. That was entirely obiter, and we think that the doctrine was unduly circumscribed, for the decisions do not distinguish between the case of a repudiation by the promisor and a mere failure to perform. Carland v. Heckler, 233 F. 504, 508, 147 C. C. A. 390 (C. C. A. 6); Firestone, etc., Co. v. Riverside Bridge Co., 247 F. 625, 160 C. C. A. 35 (C. C. A. 6); Kentucky, etc., Co. v. Lillard, 160 F. 34, 87 C. C. A. 190 (C. C. A. 6). Indeed, the rule that upon the breach of a contract of sale the damages are limited by the market price is but an instance of the same doctrine. In United States v. Sugarland Industries, 296 F. 913 (C. C. A. 5), the owner in a charter party like this failed to recover his damages because he had not exerted himself to minimize the loss. There appears to us no reason why the situation should not be regarded as an illustration of the doctrine generally applicable to all contracts. Wicker v. Hoppock, 6 Wall. 94, 18 L. Ed. 752; Warren v. Stoddart, 105 U. S. 224, 26 L. Ed. 1117.

In the case at bar, as we have already said, the owner was not necessarily bound to move the Manta at the charterers' request; but, if the circumstances were such as made compliance a trivial burden, which their consent proved, they would have refused at the peril of failing to collect full demurrage, and, that being the case, any unreasonable delay in answering was also on their account. Therefore the issue is solely of how much of the lost time was due to their unreasonable delays.

It is plain that Ullivarri supposed that Deetjen would, upon his request on the 28th, at once cable Carreras to move the Manta. In that he was in error, and the error was on his own head, because it does not appear that Deetjen had any such powers, and prima facie he had not. The supposed earlier instances of the same practice are too thinly proved to serve. Nevertheless he was authorized, as traffic agent at Havana, to receive such a request, and it was his duty to transmit it to his principal with reasonable speed. There seems to be no doubt that, at least on the afternoon of the 28th, Ullivarri had asked Deetjen to move the ship. By the morning of the 29th he must have got Ullivarri's confirmatory letter and Carreras' wire, which beyond question told him that the strike, which began on the 29th, was holding up deliveries. Yet he did nothing until the morning of the 30th when he sent a wire to New York asking leave. So far as appears this delay was without any excuse, and we do not think that the owner should collect demurrage for the period so allowed to pass by the mere inertia of its agent. But we limit the deduction to 24 hours. Had Deetjen sent a wire on the afternoon of the 28th, it is, of course, possible that he might have got an answer the next morning, which would have saved two days, but that seems to us a speculation. In fact, his wire at 11 a. m. on the 30th brought him an answer only late the next morning. The chances seem even whether he would have received the answer to a wire sent on the afternoon of the 28th before the close of business on the 29th. On this issue the charterers had the burden, and we decline to speculate upon the exact results of the delay.

The subsequent delays were not unreasonable. The only thing of which the charterers can complain is that Deetjen cabled to Carreras and Carreras to the Pastelillo superintendent before the ship's papers were prepared. But this was not unnatural. Deetjen did not know whether the strike still obstructed the carriage of sugar from the warehouse to the pier. That was at a distance of only one mile, and many things might happen in two days. He was justified in ascertaining whether it was still impossible to carry out the contract, before giving his assent to the change. So much discretion his principal's cable certainly allowed him.

[3, 4] The further defenses of estoppel and "waiver" are insubstantial. The first rests upon the notion that Ullivarri was misled by Deetjen into supposing that the ship had been moved; this because of their supposed earlier practice in that respect. But on Ullivarri's

own story Deetjen did not say that he would move her, and Ullivarri's reliance was gratuitous. Besides, if he had any warrant for his mistake, it did not and could not change his position. He could not himself move the Manta, but must wait till the owners gave the word. He could not move the sugar while the strike was on. The charterers lost nothing, if he was deceived. The supposed "waiver" amounts to no more than that the master indorsed only a small claim for demurrage on the bills of lading. That had not the slightest effect upon the right of action; not if he had five times publicly proclaimed that no demurrage at all was due, and then put it in an affidavit. It is, indeed, curious that the contrary could be thought.

[5] As to the demurrage at Matanzas, little need be added. The supposed delay was due to the failure to load at all the hatches equally. There are two replies to the defense: First, the testimony is that the lading always kept pace with the lighters actually brought to the ship as she lay in the roadstead; second, that it was good seamanship to leave the fore and after hatches for the last, so as to trim the ship properly. The appellants' case rests altogether upon the receipt given by Urquiza y Bea, which recites that the delay was due to the master's error in calculating the draft. We decline to disturb the finding below on that evidence. Urquiza y Bea, though examined, was not questioned on this point, and, although his report is an admission, we have no means of knowing how he came to make the statement. As against the express oaths of the ship's officers, we do not think that the appellants have carried the burden.

[6] The appellee raises the objection that the appellants put their rejection of the claim upon the excuse of force majeure, concededly insufficient. It is argued that this "waived" any other excuses for the detention, and made the claim for demurrage absolute. We have lately considered the point in Grace & Co. v. Panama R. R. Co., 12 F.(2d) 338, filed May 3, 1926, where we held that, unless the failure to raise an objection misleads the other party to his detriment, it has no effect upon existing rights.

Decree modified, by deducting one day's demurrage, and, as modified, affirmed. Each party to bear its own costs.

Judge ROGERS, through illness, was unable to take part in the decision of this case.