Corydon and Ohlrich, Inc., Appellee, v. Kusper Brothers Company, Appellant.

Gen. No. 45,367.

■■■■■■■ Opinion filed December 10, 1951. Released for publication January 7, 1952.

GOLAN & GOLAN, of Chicago, for appellant.

JAMES P. CAREY, JR., of Chicago, for appellee; NELSON, BOODELL & WILL, of Chicago, of counsel.

MR. JUSTICE FRIEND delivered the opinion of the court.

In March 1947 plaintiff brought suit against defendant by filing a complaint consisting of three counts alleging (1) an oral contract of sale and purchase of Mexican liquor known as tequila, (2) defendant's breach of the agreement, and (3) plaintiff's resulting damages. Defendant's answer denied the material allegations of the complaint and asserted a counterclaim for $1,914.59 for merchandise sold and delivered to plaintiff in January and February of 1947. Issue being joined by the filing of plaintiff's reply, the cause proceeded to trial in January 1950, during which defendant filed an amended and supplemental answer wherein it asserted that an accord and satisfaction had been effected in 1946. Still later in the trial defendant filed a second supplemental and additional answer averring that the contract sued on was illegal and void because the purchase price exceeded the maximum price established by the office of price administrator under the Federal Emergency Price Act of 1942. Plaintiff replied and denied these additional answers. No evidence was offered by defendant in support of its second supplemental and additional answer. The case was tried by

225

the court without a jury and at the close of all the evidence the issues were resolved in favor of plaintiff, its damages assessed at $5,276.41, and judgment entered accordingly. Defendant appeals.

The essential facts disclose that since 1933 plaintiff has been an importer and wholesale dealer in wines and liquors in Chicago, and had transacted business with defendant since 1935. In 1944 and for some time prior thereto there was a shortage of American whiskey as a result of war-time restrictions imposed on distillers, and consequently substitutes in the form of foreign liquors were sought by liquor distributors to satisfy public demand. Defendant, a wholesale distributor of liquors, operated a substantial business with several thousand regular customers. One of its important items, for which it was a key jobber, was an American whiskey called Calvert's. Its ability to obtain adequate supplies of this whiskey in 1944 was curtailed by an allocation program imposed by the distiller, and consequently defendant sought other liquors to meet the demands of its customers. One of its substitutes was Mexican tequila.

It appears that plaintiff was exclusive agent in Illinois for two Mexican manufacturers of tequila, and had previously sold defendant about 150 cases in March of 1944. Plaintiff alleged, and the court found, that about April 18, 1944 the parties entered into a contract for the purchase and sale of 500 cases of tequila at $51.60 per case, f.o.b. plaintiff's warehouse in Chicago. Defendant denied the contract, and the testimony with respect thereto is conflicting.

Einar H. Crown, one of plaintiff's two witnesses, who was president of plaintiff corporation, testified that on April 18, 1944, pursuant to appointment, Edwin Slota and Joseph Kusper of the defendant corporation came to his office and told him that because of the domestic liquor shortage and their depleted stocks,

coupled with demands for substitutes, they were seeking greater supplies of tequila. Crown told them that he had recently been in Mexico and had made arrangements there which would afford a large supply of that liquor; that the price was the same as defendant had been paying for that kind of liquor; that his arrangement with the Mexican manufacturer would enable him to import 1,000 cases; and that he was willing to let defendant have 500 cases thereof at $51.60 per case which included custom duties and internal revenue taxes. Kusper and Slota said that was satisfactory to them and they would take 500 cases; and inasmuch as they were anxious to get the merchandise Crown assured them they would be advised immediately when the shipment was available. Pursuant to Crown's instructions, his secretary, Mrs. Barrios, wrote up the order while Kusper and Slota were in the office, and they saw her making it. The order was introduced in evidence and is as follows: ''Apr 18 1944—phone when received—Kusper Bros—500 cs—12/5 th Piza Tequila Gold @ 51.60 N.S.S.'' There is undisputed evidence that in all its dealings with defendant plaintiff had never received a written order; defendant corporation's sales manager or president usually called on the telephone to place the orders and these orders were never signed. Mrs. Barrios handled the billing and work in Crown's office in connection with importations and withdrawals from custom control, and was in charge of the office in Crown's absence. She was born in Mexico, spoke Spanish, was familiar with the rules and regulations respecting imports from Mexico, and devoted her attention particularly to imports from that country.

As against the evidence introduced on behalf of plaintiff, Slota denied that he and Kusper had been in plaintiff's office at the time mentioned or that they had had any conversation at any time in the presence of

Mrs. Barrios with respect to this transaction. Slota's best recollection as to the first time he had any discussion with Crown as to buying tequila from plaintiff was that three or four weeks prior to June 6, 1944 Crown told him over the telephone that he had an opportunity to bring in some tequila and wanted to know if defendant would be interested; that Slota said they would be; that Crown told him he was bringing in 1,000 cases and wanted to know if defendant could use half of the allotment; that he told Crown that he did not know if they could use 500 cases, but that they would buy it from him as they needed it; and that the next time Slota heard from Crown was when the merchandise arrived in Chicago, when either Crown or Mrs. Barrios called him on the telephone. Kusper stated that he never was in Crown's office when tequila was discussed, nor was Mrs. Barrios there on any such occasion; that he never gave Crown an order for 500 cases of tequila; that the first time he had any conversation with Crown about tequila was in 1946; that the first time they bought any tequila from plaintiff was in the early part of 1944; that Crown telephoned one day and talked to Slota, whose desk was in the same room as Kusper's, advising him that he was receiving 1,000 cases of tequila from Mexico; that Slota turned to Kusper to ask him if they wanted some of it, quoting the price; and that Kusper then told Slota to order some.

In any event, following the April 18 conversation to which plaintiff had testified, Crown arranged for importation from Mexico to Chicago of 1,000 cases of tequila, and on May 2, 1944 telegraphed Mexico City requesting the seller to advise shipping date. Crown testified that this telegram was prompted by inquiries on the part of Slota as to what was happening to the order and how soon plaintiff could get it to Chicago. Crown

promised he would let him know as soon as he heard from the shipper.

There is documentary evidence supporting the testimony of Crown and Mrs. Barrios. In a letter written by plaintiff to defendant, dated May 22, 1944, Crown wrote as follows: "This is to advise you that we have a telegram from Mexico, D.F., that there is enroute for us a car of 1000 cases 12/5ths of Piza Tequila Gold 100 proof, on which we have your order for 500 cases. The question to answer now is whether you desire to have the entire lot of 500 cases tax paid at one time or in smaller amounts of let us say 100 cases each. Please advise us your wishes and if you desire that we keep the goods in bond in our premises, we will be glad to do so. Or when the car arrives, if you desire it transferred to your bonded premises, this we can also arrange to do."

It appears from the evidence that at the time Crown wrote this letter he thought defendant stored in a publicly-owned bonded warehouse, and of course if merchandise imported in bond were stored in such a warehouse charges would be incurred. It was agreeable to Crown to take the tequila temporarily into his own company's bonded warehouse for the period of time that he was expected to carry it and thereby save defendant the expense of public storage; otherwise, if defendant had taken the 500 cases into some other bonded warehouse on arrival in Chicago it would have been required to pay plaintiff the full contract price of $25,800, less custom duty, internal revenue and glass taxes aggregating $13,640; thereafter such duty and taxes would have to be paid by defendant before the tequila could be withdrawn from the bonded warehouse. Defendant did not answer plaintiff's letter of May 22, but Slota telephoned Crown to say he wanted the merchandise placed in plaintiff's bonded warehouse. Slota

stated that on receipt of Crown's letter he telephoned Crown and told him they had not ordered 500 cases, that Crown said he had supposed defendant had ordered it, and that Slota thereupon told him that they would buy it as they needed it. On cross-examination Slota testified that when he received the letter he took it up with Kusper who told him to call Crown; that he did so, "and discussed the pro and con of it and nothing was settled about it"; that Slota kept on telling Crown he had not ordered 500 cases, and Crown kept on saying he had the impression that they had.

Early in June 1944 plaintiff notified defendant that the tequila had arrived, whereupon Slota requested plaintiff to pay the duty and taxes on 100 cases. Following such payment, defendant took delivery and paid plaintiff the contract price of $51.60 per case. Thereafter Mrs. Barrios frequently telephoned Slota to tender delivery of the liquor. It further appears from the evidence that plaintiff invoiced defendant for an additional 100 cases of tequila on June 19 at the contract price of $51.60 per case. Defendant received this merchandise and paid for it. Mrs. Barrios prepared the invoice and mailed it to defendant, and on the bottom thereof she typed "Balance—300 cases" because, as she stated, she knew that defendant had ordered 500 cases, and after the delivery of the second 100 cases there remained a balance of 300 cases on the order. From Crown's testimony it appears that he was anxious that defendant get this merchandise out of the warehouse, whereas defendant kept countering with the excuse that they still had some on hand from the previous delivery. Crown repeatedly insisted that they take furthed delivery on the order. After the June 19 invoice Crown talked with defendant frequently about the remaining 300 cases, and called defendant's place of business several times with respect thereto. Slota told him that they still had some of the stock on hand, that sales

had slowed up due to a liquor holiday declared by government authorities in Washington in the month of August which resulted in larger allotments of domestic whiskeys, thereby adversely affecting the sale of tequila, and he accordingly asked Crown to hold the 300 cases for him a little longer.

Slota stated that when he received the June 19 invoice with the notation on the bottom showing a balance of 300 cases on hand, he was quite surprised and immediately telephoned Crown insisting that defendant was not liable for the balance of 300 cases, and he testified that in that conversation Crown "just kept on hemming and hawing around; every time we had a transaction on the Piza Tequila he always insisted on putting in 300 cases due and I kept calling him up and letting him know we were not obligated for 300 cases inasmuch as we never ordered a specific amount."

Through the latter half of 1944 and the years 1945 and 1946 there were apparently innumerable conversations with respect to the balance of the 300 cases of tequila, and invoices were sent by plaintiff to defendant which were returned, re-sent and again returned. Plaintiff also wrote to defendant in June, October and December 1946 referring to the various conversations and to the custom duties and taxes due on the balance of the order. As time went by domestic liquors became more plentiful and because of defendant's refusal to take up the balance of 300 cases, plaintiff instituted suit in March 1947.

 The fundamental question presented is whether defendant had contracted to purchase 500 cases of tequila, as alleged in the complaint and testified to by plaintiff's witnesses, and whether the court was correct in finding that it did. We have recited the salient evidence in considerable detail, and from an examination of the record are satisfied that the finding was fully warranted by the evidence, and that the wrongful

breach by defendant entitled plaintiff to the resulting damages. In assessing damages the court took the unpaid balance of the contract price, less $8,289 which is the aggregate of three items: (1) custom duty of $1,800, (2) internal revenue tax of $6,480, and (3) glass tax of $9.00 on 300 cases of tequila, and allowed defendant's counterclaim for the sum of $1,949.59 for the shipment by defendant to plaintiff of some Calvert's whiskey during the course of the controversy, leaving a balance of $5,276.41, for which judgment was entered.

██ ██ The defense of accord and satisfaction as set forth in defendant's amended and supplemental answer alleged that on or about June 11, 1946 plaintiff offered to accept in settlement 300 cases of whiskey (Calvert's) from defendant at defendant's costs, that defendant accepted the offer and delivered 121 cases, part of which plaintiff paid for, but on plaintiff's refusal to pay for subsequent shipments defendant discontinued them. As heretofore stated, plaintiff denied these allegations. Under the established rule it was incumbent on defendant to assume the burden of establishing its claim of accord and satisfaction by a preponderance of evidence. *Kelley v. Martin,* 169 Ill. App. 92. The evidence on this phase of the case was in sharp conflict, and the trial judge found against defendant. The defense of accord and satisfaction is predicated upon a proposal by plaintiff with respect to possible settlement of plaintiff's claim contained in its letter of June 11, 1946 to the effect that if defendant would sell plaintiff 300 cases of blended whiskey (Calvert's) at cost, plaintiff would abandon its right to payment for the 300 cases of tequila that plaintiff was holding in bond. Defendant made no reply to this letter, and when a subsequent letter of June 20, 1946 was sent by plaintiff, defendant again ignored the proposal. Thereafter several conversations ensued wherein Crown called Slota's attention to the fact that plaintiff was paying

interest on a bank loan made to finance the tequila shipment from Mexico and that he felt the least defendant could do under the circumstances was to let him have some Calvert's whiskey on which he could make a small profit and thereby reimburse plaintiff in part at least for the interest it was paying on the bank loan. An effective answer to the contention is that the proposal in Crown's letters was never accepted by defendant; there was no meeting of the minds. As held in *In re Estate of Cunningham,* 311 Ill. 311, "in order to constitute a bar to an action on the original claim the accord must be fully executed." The accord was never executed in the case at bar.

██ There is no merit in the defense interposed in the second supplemental and additional answer averring that the contract sued on was illegal and void because the purchase price of the tequila exceeded the maximum price established by the office of price administrator under the Federal Emergency Price Control Act of 1942. This was plainly an afterthought; no evidence was introduced by defendant in support of this defense, and it is not argued in defendant's brief.

██ There remains defendant's contention that plaintiff should have mitigated its damages. We have already indicated that plaintiff was unaware the defendant did not intend to perform its contract until it received the letter of January 20, 1947 from defendant's lawyers, wherein it denied having agreed to purchase 500 cases of tequila. The occasion to mitigate damages does not arise until a party is cognizant of the fact that a wrong has been committed. *Laker v. Damon,* 17 Pick (Mass.) 284; *City of Garrett v. Winterich,* 44 Ind. App. 322, 87 N. E. 161. Repeated assurances of defendant that it would eventually take the 300 cases of tequila as needed was sufficient justification for plaintiff's failure to attempt to minimize the loss, at least so long as there was ground for expecting

233

the defendant would perform. *Kentucky Distilleries & Warehouse Co. v. Lillard,* 160 Fed. 34; *Illinois Cent. R. Co. v. Doss,* 137 Ky. 659, 126 S. W. 349. Moreover, there is no evidence from which the inference may be drawn that plaintiff could have mitigated its damages after January 1947. Both parties seem to agree, and they so stated on oral argument, that after termination of hostilities in Europe in May of 1945 whiskey became more plentiful, and the market for imported substitutes was destroyed. There is also the circumstance that defendant sold Calvert's whiskey to the retailer at approximately $40 a case, whereas Mexican tequila would have been priced around $56 retail. The disparity between the prices of these two liquors, with American whiskey available, would have made it fairly impossible to dispose of the tequila which plaintiff held for defendant's account. The instant case falls under the doctrine enunciated under *Freedman v. Madison & Kedzie State Bank,* 259 Ill. App. 519, where the seller of bonds, with an agreement to repurchase, failed to perform the agreement; there it was held that the buyer was not limited to an action to recover damages but could tender the bonds, keep the tender good and sue for the agreed price. The court in that case relied on *Osgood v. Skinner,* 211 Ill. 229, a decision dealing with a prospective purchaser of shares of stock who had refused to perform his contract; the court held that the seller who had offered performance could consider the shares of stock as the purchaser's, and either sell them and sue for the unpaid balance of the price or hold them subject to the purchaser's order and recover the whole price. Inasmuch as we hold that the oral contract was made as alleged and as found by the court, and that there is abundant evidence to support the finding, the foregoing rule of law applies, thus entitling plaintiff to recover the contract price of the tequila liquor which defendant had purchased.

For the reasons indicated, the finding and judgment of the superior court is affirmed.

*Judgment affirmed.*

BURKE, P. J. and NIEMEYER, J., concur.